44 Cal.Rptr.3d 724 (2006)
140 Cal.App.4th 676
In re ENRIQUE G., a Person Coming Under the Juvenile Court Law.
San Diego County Health and Human Services Agency, Plaintiff and Respondent,
v.
Athena V. et al., Defendants and Appellants.
No. D047692.
Court of Appeal, Fourth District, Division One.
June 19, 2006.
*726 Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Athena V.
Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant Bernardo G.
John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.
Mary Elizabeth Handy, under appointment by the Court of Appeal, for Minor.
*725 AARON, J.
Athena V. and Bernardo G. appeal a judgment terminating their parental rights over Enrique G. Athena contends that the juvenile court violated her due process rights by appointing a guardian ad litem for her and that the appointment order is not supported by substantial evidence. Bernardo joins in Athena's contentions.[1] We affirm.

BACKGROUND
On June 23, 2004, 22-month-old Enrique was with Athena at a shopping mall. She yelled at him and screamed obscenities, threw food at him, shook him, and hit him in the face. When a witness confronted her, Athena said, "This is my kid and I can do whatever I want." The police were called and took Enrique to Polinsky Children's Center (Polinsky), an emergency shelter operated by the San Diego County Health and Human Services Agency (Agency).[2] A physical examination of Enrique revealed that he had been physically abused.
On June 24, 2004, Athena left several telephone messages for the Agency social *727 worker assigned to the case, asking when she could pick up Enrique. She went to Polinsky and made the same inquiry. A staff member at Polinsky apparently telephoned the social worker, who spoke with Athena. Athena seemed not to understand the social worker's repeated explanations that the social worker had to discuss the allegations with Athena. The social worker suggested that Athena visit Enrique and that she come to the social worker's office the following morning. Athena said she would try. The social worker offered to go to Athena's home, but Athena said she had just moved and that she did not know her address.
On June 25, Athena went to the social worker's office. She still did not understand why Enrique had been taken into custody. Athena denied that she had hit Enrique, but admitted that she had spanked him on the shoulder and buttock. She characterized her actions as "discipline" for Enrique "throwing a fit" and having a "smart mouth," but acknowledged that Enrique could say only "mommy," "hi," and "bye." She said, "I am probably going to end up on the mental ward because of this."
On June 28, the Agency filed a dependency petition alleging that Athena had shaken Enrique and struck him in the face with her hand. Athena did not appear at the detention hearing.
At a supervised visit on July 6, Athena initially did not recognize Enrique. Enrique did not respond to Athena at first, but later during the visit, he cried and did not want to let her go. Athena stated that Enrique was "like a ball and chain." She screamed at him and said that his stay in foster care might teach him a lesson.
At a visit on July 12, Athena grabbed Enrique and forcefully kissed him. He cried and squirmed out of her grasp. Athena said she believed it was acceptable for her to hit Enrique if he cried or acted up, and insisted repeatedly that she had done nothing wrong. Athena talked about the dependency case in Enrique's presence, used foul language, and displayed rapid mood swings.
Athena appeared in court on July 20, the date set for the jurisdictional and dispositional hearing. The court appointed counsel for her and continued the matter to August 3.
Athena failed to appear for a July 26 visit. Afterward, she left a telephone message for the social worker apologizing for having missed the visit and saying that she would call back.
On August 3, Athena appeared in court with her appointed counsel. Counsel requested that the court appoint a guardian ad litem for Athena, saying that it would assist him in effectively representing her. The court granted the request. The court noted that Athena had not been arraigned. Counsel responded that he could not effectively arraign her. The court scheduled a settlement conference for September 13 and a contested jurisdictional and dispositional hearing for September 20, and ordered Athena to return for both hearings.
After the August 3 hearing, Athena had no further contact with the Agency for more than a year. She did not appear for hearings, visit Enrique, or respond to telephone calls, letters, or visits to her last known address.
On September 20, the court denied Athena's counsel's request for a continuance. It entered a true finding on the petition and removed Enrique from Athena's custody.
On May 27, 2005, Enrique's maternal grandmother, Debrah S., telephoned social worker Richard Estrada. Debrah told Estrada that Athena had asked her to call *728 and inquire whether Enrique was going to be adopted. Estrada informed Debrah of the June 16 six-month review hearing, asked her to inform Athena of the date of the hearing, and inquired regarding how Athena was doing. Debrah said that in February, Athena's brother had told Debrah that Athena was dying. Debrah said that she picked up Athena from Athena's father's home in San Diego and took her to Rancho Springs Medical Center in Riverside. Debrah told Estrada that Athena had tuberculosis, that she was still quarantined in the hospital, and that she probably would not be released any time soon. Debrah said she thought Athena had been in a rehabilitation program in Tijuana before she was hospitalized. On June 15, Estrada attempted to contact Athena at the hospital. Hospital personnel told him that Athena had not been there for a couple of weeks.
At the June 16 six-month review hearing, the court denied Athena's counsel's request for a continuance and set a Welfare and Institutions Code section 366.26[3] hearing for October 13. On June 21, Athena's guardian ad litem filed a notice of intent to file a writ petition challenging the June 16 order. In July, Athena's counsel in the writ proceeding notified this court that there were no viable issues for writ review, and on July 27, this court dismissed the writ proceeding.
On August 20, Athena was personally served with notice of the October 13 section 366.26 hearing. She appeared in court on October 13. Her attorney asked that the guardian ad litem be relieved. Counsel stated, "I took some extra time this morning and spoke with [Athena] about the case history, the consequences in general, and she understands the basics of what is going on. She, of course, has her own view of the evidence and of what she prefers the outcome to be. As far as being a client who can effectively participate with her lawyer, she is fine."
The guardian ad litem agreed that he should be relieved. He said, "I have spoken to [Athena] this morning. She's quite different than when I last had contact with her, which was really back at the beginning of the case. She is focused. Her answers are appropriate. They are relevant. I really don't see any reason why she would need a guardian ad litem to assist her in dealing with her attorney at this time. I think she is fully capable of assisting [counsel] with her case." The guardian ad litem also said that he had asked Athena about her tuberculosis, and that she told him she was on medication and "being followed by some form of health services."
Based on the statements of counsel and the guardian ad litem, the court found that Athena no longer required a guardian ad litem. It relieved the guardian ad litem, set a November 30 pretrial conference and a December 8 contested section 366.26 hearing, and ordered Athena to return to court on November 30.
Athena had two supervised visits with Enrique in late October 2005. A third visit was scheduled for early November. Enrique's maternal grandfather called the social worker to ask that the visit be rescheduled. The social worker left two telephone messages for Athena, but Athena never returned the calls. She did, however, appear in court on November 30. She had a visit with Enrique in early December, and attended the December 8 section 366.26 hearing.

ATHENA'S APPEAL IS PROCEDURALLY PROPER
The Agency raises three procedural arguments. First, it asserts that Athena *729 has abandoned her appeal by failing to raise any contentions concerning the termination of her parental rights. Second, it argues that she has forfeited her right to object to the appointment of the guardian ad litem because she did not object below. Third, it claims she did not file a timely notice of appeal from the appointment order. The courts in In re Joann E. (2002) 104 Cal.App.4th 347, 128 Cal.Rptr.2d 189 and In re Jessica G. (2001) 93 Cal.App.4th 1180, 113 Cal.Rptr.2d 714 rejected similar arguments regarding forfeiture and timeliness.
In In re Joann E., supra, 104 Cal. App.4th at pages 350-351, 357, 128 Cal. Rptr.2d 189, the court appointed a guardian ad litem for the grandmother, who had been Joann's guardian ad litem, in March or April 2001, before the jurisdictional hearing had concluded. The appeal was from the December 4 dispositional order. (Id. at p. 353, 128 Cal.Rptr.2d 189.) The social services agency argued that the grandmother's challenge to the appointment of the guardian ad litem was untimely because the time within which to file an appeal or writ petition had expired. (Ibid.) The court noted that the dispositional order was the first appealable order, and that there was no requirement that a party seek writ review earlier. (Id. at pp. 353-354, 128 Cal.Rptr.2d 189.) It also cited the In re Jessica G. court's rejection of the waiver argument. (In re Joann E., supra, 104 Cal.App.4th at p. 354, 128 Cal. Rptr.2d 189, citing In re Jessica G., supra, 93 Cal.App.4th 1180 at p. 1190, 113 Cal. Rptr.2d 714.)
In In re Jessica G., supra, 93 Cal. App.4th at pages 1185-1186, 113 Cal. Rptr.2d 714, the section 366.26 hearing began in July 2000 and concluded in April 2001. In January 2001, the court appointed a guardian ad litem for the mother. (Ibid.) In her appeal from the termination of her parental rights, the mother challenged the appointment. (Id. at p. 1186, 113 Cal.Rptr.2d 714.) The social services agency argued that because the mother had not filed a writ petition earlier, she could not raise the issue on appeal. (Id. at p. 1190, 113 Cal.Rptr.2d 714.) The reviewing court rejected this argument, stating, "The waiver rule is indeed the general rule. [Citations.] But it is not the universal rule.... `[T]he waiver rule will be enforced unless due process forbids it.' [Citation.] We already have pointed out that the order violated Mother's due process rights. The Department argues that she should have done something about it then, by taking a prompt writ. [Citation.] [¶] How could Mother have done so? Her attorney looked to the guardian ad litem, and that person could hardly be expected to endorse a writ questioning the legality of her appointment. Mother was in a Catch-22 situation in which she had a bare remedy with no real knowledge or ability of how to use it and no attorney to whom she could turn to effect it. Insisting that she take a writ at that point or lose her right to later complain about violation of her constitutional rights would itself pose constitutional issues." (Ibid., fn. omitted.)
While the procedural posture of this case differs from that in In re Joann E., supra, 104 Cal.App.4th 347, 128 Cal. Rptr.2d 189 and In re Jessica G., supra, 93 Cal.App.4th 1180, 113 Cal.Rptr.2d 714, the reasoning in those cases applies here. One could not expect Athena's guardian ad litem to seek review of the order appointing him. Similarly, one could not expect her counsel to seek review of the very order he requested. Athena was not informed that she had the right to object to the appointment of the guardian ad litem, or that she had the right to seek review of the appointment order or of the subsequent dispositional order. After the six-month review hearing, the clerk of the *730 juvenile court mailed Athena a notice of her right to seek writ review, but it is not clear that the notice was sent to the correct address.

THE COURT VIOLATED ATHENA'S DUE PROCESS RIGHTS BY APPOINTING A GUARDIAN AD LITEM
"The appointment of a guardian ad litem for a parent in a dependency proceeding is significant because the effect of such an appointment is to remove the control of litigation from the parent. [Citation.] Consequently, the parent's due process rights must be protected before a guardian ad litem is appointed. [Citation.] Those rights are satisfied if the parent consents to the appointment of a guardian ad litem or, if the parent does not consent, the court holds an informal hearing in which the parent has an opportunity to explain why a guardian ad litem is not required. [Citation.] Further, the court may not appoint a guardian ad litem until the party has been properly served. [Citation.]" (In re Daniel S. (2004) 115 Cal. App.4th 903, 908, 912-913 & fn. 9, 9 Cal. Rptr.3d 646, italics added.)
At the informal hearing, the court or counsel must explain the purpose of a guardian ad litem, why counsel believes the appointment is necessary, and what authority the parent will cede to the guardian ad litem. (In re Jessica G., supra, 93 Cal.App.4th at p. 1188, 113 Cal. Rptr.2d 714.) The parent must be given the opportunity to respond. (Ibid.) "`At a minimum, the court should make an inquiry sufficient to satisfy it that the parent is, or is not, competent; i.e., whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights.'" (Ibid, quoting In re Sara D. (2001) 87 Cal.App.4th 661, 672, 104 Cal.Rptr.2d 909.)
None of these requirements was met in this case. Athena was not provided notice that her counsel was going to request the appointment of a guardian ad litem, and she was not given an opportunity to respond to the request. No one explained to her what a guardian ad litem is, or the function a guardian ad litem serves. No one explained to Athena what authority she would cede to a guardian ad litem. There was no inquiry as to whether Athena understood the nature of the proceedings or was able to assist her counsel in protecting her rights, and no one indicated on the record why appointment of a guardian ad litem might be necessary. The order appointing the guardian ad litem was based solely on the statement of Athena's counsel that the appointment would assist him in representing her effectively.[4] The procedure followed was wholly inadequate.

THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT
In Arizona v. Fulminante (1991) 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, the court recognized that, as a general rule, constitutional error does not automatically require reversal, and that in determining the effect of "most constitutional errors," appellate courts may properly apply a Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 harmless error analysis. (Arizona v. Fulminante, supra, 499 U.S. at p. 306, 111 S.Ct. 1246.) According to the Supreme Court, the "common thread" connecting *731 cases in which courts have applied the Chapman v. California, supra, harmless error analysis "is that each involved `trial error'  error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (Arizona v. Fulminante, supra, 499 U.S. at p. 307, 111 S.Ct. 1246.) The Arizona v. Fulminante court explained that the harmless error doctrine is "essential to preserve the `principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' [Citation.]" (Id. at p. 308, 111 S.Ct. 1246.)
In contrast, "structural" errors involve "`basic protections, [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' [Citation.]" (Arizona v. Fulminante, supra, 499 U.S. at p. 310, 111 S.Ct. 1246.) A structural error requires reversal without regard to the strength of the evidence or other circumstances. (Ibid.) Examples of structural errors in the criminal context include the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial, and an erroneous reasonable doubt instruction to the jury. (Id. at pp. 309-310, 111 S.Ct. 1246.)
"Although Arizona v. Fulminante, supra, 499 U.S. 279, 111 S.Ct. 1246, analyzed the consequence of an error implicating the constitutional rights of a criminal defendant, California courts have frequently relied upon such United States Supreme Court analysis in analogous situations in which the fundamental constitutional right to parent is the subject of some error." (Judith P. v. Superior Court (2002) 102 Cal.App.4th 535, 554, 126 Cal.Rptr.2d 14.) "Although parents in dependency proceedings are not prosecuted as defendants, petitions often contain allegations of criminal activity[, and dependency] proceedings are `adversarial in nature.' [Citation.]" (In re Kristin H. (1996) 46 Cal.App.4th 1635, 1662, 54 Cal.Rptr.2d 722 [concluding that termination of parental right is a "punitive sanction"].)
We conclude that the appointment of a guardian ad litem in violation of a parent's due process rights is a trial error, not a structural one. Case law supports this conclusion. (In re Daniel S., supra, 115 Cal.App.4th at pp. 908, 912-916, 9 Cal.Rptr.3d 646 [the appointment of a guardian ad litem without proper notice was harmless beyond a reasonable doubt because the mother was unable to "process anything"; despite being on medication, she was agitated, angry, aggressive and unstable; she was in intensive care and not allowed to attend the hearing because she was "too much of a risk"; five days before the appointment, she was unable to comprehend what a social worker told her; the court could not delay the hearing; and the result of the hearing would have been the same had notice been proper and a guardian ad litem not appointed]; In re Sara D., supra, 87 Cal.App.4th at pp. 672-673, 104 Cal.Rptr.2d 909 [the appointment of a guardian ad litem without affording the mother an opportunity to be heard was not harmless beyond a reasonable doubt because before the appointment, the mother's counsel told the court that he would call the mother and three other witnesses; after the appointment, counsel and the *732 guardian ad litem agreed to submit to the court's jurisdiction in exchange for an agreement to amend the petition to conform to proof; the reviewing court could not speculate whether the mother would have submitted or how the witnesses' testimony might have affected the juvenile court's decision]; In re Jessica G., supra, 93 Cal.App.4th at pp. 1189-1190, 113 Cal. Rptr.2d 714 [the error was not harmless beyond a reasonable doubt because it was unknown what the mother might have done or suggested to her attorney if the guardian ad litem had not been appointed], but see In re C.G. (2005) 129 Cal.App.4th 27, 33-34, 27 Cal.Rptr.3d 872 [appointment of a guardian ad litem in violation of the mother's due process rights was a structural error requiring automatic reversal].)
The erroneous appointment of the guardian ad litem in this case is not like other errors that have been found to be structural. (Cf. In re Jasmine G. (2005) 127 Cal.App.4th 1109, 1116, 26 Cal. Rptr.3d 394 ["the failure to attempt to give a parent statutorily required notice" of a termination hearing was a structural defect requiring automatic reversal because it deprived the parent of a meaningful opportunity to be heard]; Judith P. v. Superior Court, supra, 102 Cal.App.4th at pp. 553-558, 126 Cal.Rptr.2d 14 [not serving the mother with the status report at least 10 days before the review hearing at which the juvenile court set a section 366.26 hearing constituted a structural error where the mother did not waive her right to timely service and the court denied her request for a continuance].) Here, as we discuss below, we can assess the harm resulting from the error.
Athena does not cite any prejudice resulting from the appointment of a guardian ad litem. Neither her counsel nor her guardian ad litem compromised her fundamental rights. (In re Daniel S., supra, 115 Cal.App.4th at p. 914, 9 Cal.Rptr.3d 646.) On the contrary, they acted to ensure that Athena received the broadest protection of her rights at each juncture, throughout the proceedings. Counsel repeatedly requested continuances because Athena was not present, requested contested hearings, and requested that reunification services continue. Counsel and the guardian ad litem instituted writ proceedings to challenge the setting of the section 366.26 hearing.
The court ordered reunification services for Athena, but she failed to participate in any of the services the Agency offered. She did not visit Enrique and failed to remain in contact with the Agency. She did not respond to the social worker's telephone calls, letters, or visits to her last known address. She also failed to appear for hearings of which she received notice.
Under the circumstances of this case, it is clear that the outcome of the proceedings would have been the same even if the court had not appointed a guardian ad litem for Athena. The error was thus harmless beyond a reasonable doubt.

DISPOSITION
The judgment is affirmed.
WE CONCUR: BENKE, Acting P.J., and McDONALD, J.
NOTES
[1] Because we affirm the judgment, we need not address the respondent's arguments that Bernardo lacks standing and that he has abandoned his appeal by failing to raise any contentions concerning the termination of his parental rights.
[2] In June or July, Enrique was moved to a foster home. He remained there until June 2005, when he was moved to a different foster home.
[3] Statutory references are to the Welfare and Institutions Code.
[4] One component of Athena's due process contention is the lack of evidence offered to support the appointment. Thus, her substantial evidence contention is logically subsumed in her due process contention.