58 Cal.Rptr.3d 321 (2007)
150 Cal.App.4th 278
In re JACLYN S., a Person Coming Under the Juvenile Court Law.
Sonoma County Human Services Department, Plaintiff and Respondent,
v.
Lisa S., Defendant and Appellant.
No. A114754.
Court of Appeal of California, First District, Division One.
April 25, 2007.
*324 Steven M. Woodside, Sonoma County Counsel, Phyllis Gallagher, Deputy Sonoma County Counsel, Counsel for Plaintiff and Respondent.
Elena E. Matsis, by Appointment of the First District, Appellate Program, Counsel for Defendant and Appellant.
Certified for Partial Publication.[*]
STEIN, Acting P.J.
This is an appeal by a mother from an order terminating her parental rights. (Welf. & Inst.Code, § 366.26.)[1] We affirm.

Background
Appellant's child was born on December 17, 2005. According to hospital records, the mother came in off the street in labor. She was dirty and disoriented and uncooperative, but the child was delivered without problem. The child was premature and had a cleft palate, inhibiting the ability to nurse. After the delivery, the mother was noted to be very anxious and paranoid and suffering from hallucinations. Both the mother and child tested positive for methamphetamine and amphetamine, with ratings indicating very recent use. The child was placed in the intensive care nursery. According to hospital records, the mother's condition and behavior caused the hospital to call a mental health facility, which was familiar with the mother and responded she was not schizophrenic, but did suffer from psychosis secondary to polysubstance abuse. The hospital mental health staff determined the mother was not a threat to herself or others, but reported she was uncooperative and would not follow any recommendations for treatment. A friend of the family told nursing staff the mother had been homeless for four years, and had a history of psychiatric disorders and alcohol abuse.
A petition was filed on December 29, 2005, alleging a failure to protect and a lack of provision for support. The petition was supported by the report of a social worker for the county human services agency (the agency). The mother had told the hospital social worker she had handled her own prenatal care. She also said she *325 had had regular prenatal care, but she refused to sign a release that would allow the social worker to confirm that claim. She stated she had a place to live, but gave several different stories about where she was living. She did not know who the child's father was, explaining she had had a sexual encounter with a man but did not know his name. She refused to sign a medical release for the child. The social worker also reported the mother had another child, who had been detained in 2001 after the mother had been arrested for being under the influence of methamphetamine. The mother's parental rights in that child were terminated in 2003, and the child has been adopted.
The mother and her attorney appeared at a hearing held on January 17, 2006. The juvenile court, at the request of the mother's attorney, and after discussing the matter with the mother, appointed a guardian ad litem for the mother, and set the matter over to February 2, 2006, for the jurisdictional hearing. The mother appeared with the guardian ad litem and her attorney on February 2. Her attorney informed the court the guardian ad litem had explained to the mother her right to contest the jurisdictional report and the consequences of submitting the matter on the report, and the mother had agreed to submit the matter on the report. The court discussed the matter with the mother, who, while complaining that the report was inaccurate and stating a concern that the child was being put up for adoption, confirmed she had spoken with the guardian ad litem and had agreed that the matter should be submitted on the report.[2] The court found the allegations of the petition *326 to be true, and exercised jurisdiction over the child. The mother had told the social worker she had no Indian ancestry, but at the hearing the mother asserted her mother's father "is full, almost full-blooded Indian." The court therefore ruled the Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (ICWA)) might apply. The mother provided the court with a permanent mailing address, which the court ruled would be used for purposes of notice unless or until the mother provided written notice of a new permanent mailing address.
The matter was put over to February 22. The mother had been notified of the hearing, but failed to appear. The mother's attorney and the guardian ad litem were present, as were the attorneys for the child and for the agency. The mother's attorney requested a contested hearing, which was set for March 20, 2006.
The mother did not appear at the March 20, 2006 dispositional hearing. By this time, the mother's visitation with the child had been suspended, as it had been determined her behavior during scheduled visits posed a high risk of safety to the child and to the social worker monitoring the visits.[3] The social worker reported she had spoken to the mother by telephone, informing her of the date of the hearing. The guardian ad litem reported she had been attempting to reach the mother by telephone, using three different numbers that had been provided to her. Three weeks previously, she had reached a man named Ron who said he wasn't going to have anything to do with the mother. The guardian ad litem also reached the maternal grandmother, who stated she had no idea where the mother was, but said her home was always a resource for the mother. The mother had never contacted the guardian ad litem, but the friend, Ron, had delivered an envelope of handwritten notes from the mother that morning. The guardian ad litem had urged him to have the mother show up for the hearing. The guardian ad litem and the mother's attorney then submitted the matter on the agency's report and recommendations. The guardian ad litem signed a waiver of rights on the mother's behalf.
The court found reunification services had been terminated in connection with the mother's older child because the parents had failed to reunify with that child and the mother had not made reasonable efforts to treat the problems that had caused the child to be removed from her care and custody. The court also found the mother had a history of extensive, *327 abusive and chronic use of drugs or alcohol, and had resisted prior court-ordered treatment for the problem during the three-year period immediately prior to the filing of the petition in this case. It found the mother had received actual and constructive notice of the proceedings, but had voluntarily absented herself from them. It found the mother had made no progress toward alleviating or mitigating the causes necessitating removal of the child from her custody. The court ruled reunification efforts would not benefit the child or be in the child's best interests. It set the matter over for a section 366.26 selection and implementation hearing.
The selection and implementation hearing was held on July 24, 2006. The mother was present, as were her attorney and the guardian ad litem. The child had been living with a foster family for several months, had adjusted well and was responding positively to all the family members. The foster parents wished to adopt her. The mother's attorney reported the guardian ad litem had informed her the mother had requested a new attorney, a new guardian ad litem and a new judicial officer. The guardian ad litem had instructed the attorney to submit the matter to the court with the mother's comments. The court discussed the situation with the mother, telling her it was not going to step down, was going to deny the mother's requests and would be accepting the direction of the guardian ad litem to submit the matter on the agency's report. The court found it likely the child would be adopted and that termination of parental rights would not be detrimental to the child. It therefore terminated the mother's parental rights and ordered a permanent plan of adoption.

Discussion

I.

Appointment of Guardian Ad Litem
The mother claims error in the appointment of the guardian ad litem.
As a threshold matter, we agree with the parties that the mother did not forfeit her right to make this claim by failing to attack the appointment by writ. (See In re Joann E. (2002) 104 Cal. App.4th 347, 353-354, 128 Cal.Rptr.2d 189 (Joann E.) and In re Jessica G. (2001) 93 Cal.App.4th 1180, 1190, 113 Cal.Rptr.2d 714 (Jessica G.).)[4]
As applied to dependency cases, section 372 of the Code of Civil Procedure requires the appointment of a guardian ad litem if a parent is incompetent. (In re Sara D. (2001) 87 Cal.App.4th 661, 667, 104 Cal.Rptr.2d 909 (Sara D.) A parent is incompetent if the parent is unable to understand the proceedings or cannot assist the attorney in protecting the parent's interests in the companionship, custody, control and maintenance of the child. (In re Enrique G. (2006) 140 Cal.App.4th 676, 684, 44 Cal.Rptr.3d 724 (Enrique G.); Jessica G., supra, 93 Cal.App.4th at p. 1186, 113 Cal.Rptr.2d 714; Sara D., supra, 87 Cal.App.4th at p. 667, 104 Cal.Rptr.2d 909.) When the court has knowledge of the parent's incompetency, its failure to appoint a guardian ad litem is error. (In re Lisa M. (1986) 177 Cal.App.3d 915, 919, *328 225 Cal.Rptr. 7.) But case law also has established it is error, and a denial of due process, to appoint a guardian ad litem if the parent has not agreed to the appointment or is not truly incompetent, because the effect of the appointment is to remove the control of litigation from the parent. (In re C.G. (2005) 129 Cal.App.4th 27, 32-35, 27 Cal.Rptr.3d 872 (C.G.); In re Daniel S. (2004) 115 Cal.App.4th 903, 912, 9 Cal. Rptr.3d 646 (Daniel S.); Joann E., supra, 104 Cal.App.4th at pp. 354-359, 128 Cal. Rptr.2d 189; Jessica G., supra, at pp. 1186-1189, 113 Cal.Rptr.2d 714; Sara D., supra, at pp. 667-674, 104 Cal.Rptr.2d 909.) There is a split in authority as to the nature of the error. Most courts require reversal only if the reviewing court cannot say the error was harmless beyond a reasonable doubt. (Enrique G., supra, at pp. 684-685, 44 Cal.Rptr.3d 724; Joann E., supra, at p. 359, 128 Cal.Rptr.2d 189; Sara D., supra, at p. 673, 104 Cal.Rptr.2d 909.) There also is authority for holding the error to be structural, requiring reversal of subsequent orders even without a showing of resulting prejudice. (C. G., supra, at pp. 33-34, 27 Cal.Rptr.3d 872.)[5]

Due Process
The parent's due process rights are satisfied if the parent consents to the appointment of a guardian ad litem or, if the parent does not consent, the court holds an informal hearing in which the parent has an opportunity to explain why a guardian ad litem is not required. (Enrique G., supra, 140 Cal.App.4th at p. 683, 44 Cal.Rptr.3d 724; Daniel S., supra, 115 Cal.App.4th at p. 912, 9 Cal.Rptr.3d 646.) It has been held that at the informal hearing, the court or the parent's attorney must explain the purpose of a guardian ad litem, why counsel believes the appointment is necessary, and what authority the parent will be ceding to the guardian ad litem. The parent must be given the opportunity to respond. (Enrique G., supra, at p. 684, 44 Cal.Rptr.3d 724; Jessica G., supra, 93 Cal.App.4th at p. 1188, 113 Cal. Rptr.2d 714.) "At a minimum, the court should make an inquiry sufficient to satisfy it that the parent is, or is not, competent; i.e., whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights." (Sara D., supra, 87 Cal.App.4th at p. 672, 104 Cal.Rptr.2d 909; Enrique G., supra, at p. 684, 44 Cal.Rptr.3d 724; Jessica G., supra, at p. 1188, 113 Cal.Rptr.2d 714.)
The court here conducted an informal hearing. The mother's attorney told the court the mother had been uncooperative, failing to show up for an appointed meeting and on other occasions leaving messages she was too emotionally upset to meet with the attorney. As result, the attorney had been unable to meet with the mother prior to the date of the hearing. The mother then suggested a new attorney be appointed for her "like maybe Pat [Lansdowne] ... somebody that wants to represent me. Because, obviously, we don'tshe doesn't like me, so I'm feeling little bit insecure from the get-go." The mother's attorney stated she had spoken with Ms. Lansdowne, who was available and willing to be the mother's guardian ad litem. The court explained to the mother, "[the attorney] is asking that this Court, if it appoints Ms. Lansdowne, that she would essentially be a person to assist you and to act on your behalf in this matter in coordination with [the attorney] because [the attorney] is claiming that you are not able to fully understand and grasp what is going *329 on here." The mother disagreed with the attorney's assessment. The attorney explained the mother's emotional state alternated from high to low, making it difficult to speak to her or to get her to do something she said she would do.
The court stated a guardian ad litem will be appointed "where there is inability to cooperate meaningfully with counsel because of whatever condition is in existence." It asked if there was any evidence of the need for the appointment besides the mother's emotional ups and downs and instability. The court also asked the mother about the proceedings leading to the termination of her rights in her other child. The mother did not appear to understand what the court was asking, and spoke instead about the difficulties she had experienced trying to reach her attorney. The court asked the agency's attorney for his comments. The attorney began to talk about the earlier case, but was interrupted by the mother who complained that neither she nor her other child wanted the child to be talked about. The agency's attorney then spoke about the agency's contacts with the mother, stating the social worker also had asked that a guardian ad litem be appointed and had expressed concern about the mother's ability to understand and participate in the proceedings. The attorney asserted the mother had experienced difficulty understanding the court's questions in a previous proceeding, and also in understanding a standard letter from the agency. On numerous occasions the mother's conversations with the social worker indicated she was confused and disoriented. She had been late for visits and meetings. On one occasion the social worker had written down for the mother the date and time of a visit, but within five minutes the mother had called from the parking lot, acting as if the conversation never had taken place.
The court told the mother it was thinking of appointing Ms. Lansdowne to assist her. "But it'sshe would not technically be your lawyer. She would technically be kind of like consulting with [your attorney] on your behalf if you were not 100 percent aware of everything that you needed to be aware of. In other words, Ms. Lansdowne would be empowered to speak with you and then act in your interests as more as like a client than as a lawyer for you. [1] So is that something that you would feel would be beneficial to you?" The mother replied, "I pretty much understand. I just feel that we haven't had enough time to discuss anything, but I think that that might be better because I don't think she's understanding me. So that would probably be better."
The mother's position is that she did not agree to the appointment because its consequences had not been explained to her. She argues, further, the evidence did not establish she suffered from a condition rendering her unable to understand the nature of the proceedings or to assist her attorney, justifying an involuntary appointment. She complains that in deciding to appoint a guardian ad litem, the court improperly considered hearsay evidence contained in the agency's report or asserted by the agency's attorney. (See Sara D., supra, 87 Cal.App.4th at p. 674, 104 Cal.Rptr.2d 909, questioning whether the multiple hearsay in social studies would be admissible to determine whether an adult is incompetent.) The mother also contends no weight should be given to the trial court's personal observation of the mother.
We are troubled by what appears to be the view that the appointment of a guardian ad litem is an act adverse to a parent, depriving the parent of the ability to present his or her case. A guardian ad litem is appointed to protect the parent's *330 rights, and to act on the parent's behalf. The guardian may make tactical and even fundamental decisions affecting the litigation, but always with the interest of the guardian's charge in mind. (In re Christina B. (1993) 19 Cal.App.4th 1441, 1454, 23 Cal.Rptr.2d 918 (Christina B.); and see In re Josiah Z. (2005) 36 Cal.4th 664, 678, 31 Cal.Rptr.3d 472, 115 P.3d 1133.) In civil matters, the guardian is an officer of the court, and, like any other officer, is subject to court supervision. (Regency Health Services, Inc. v. Superior Court (1998) 64 Cal.App.4th 1496, 1502, 76 Cal.Rptr.2d 95.) Where the guardian exceeds his or her powers, so that the parent is deprived of some fundamental right, reversal is required. (Ibid.) But we can see no reason to reverse when the guardian ad litem, although erroneously appointed, presents the parent's case when the parent has absented herself from the proceedings and cannot or will not act on her own behalf. We also see no reason to assume a guardian ad litem has abandoned the role of guardian, has ignored the parent's wishes and has failed to protect or advance the parent's interests, or that the trial court ignored its own responsibility to oversee the guardian's conduct. Finally, while it is always possible the guardian ad litem, in attempting to protect the parent's interests, acts against the parent's wishes, it is difficult to see how that action could lead to reversible error if it did not compromise the parent's case.
In addition, whether due process is served requires more than a consideration of the parent's interests. As the court in Sara D., recognized, "Due process is a flexible concept which requires balancing of several factors, including (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, (3) the interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Sara D., supra, 87 Cal.App.4th at p. 671, 104 Cal. Rptr.2d 909.) (And see In re Sade C. (1996) 13 Cal.4th 952, 989, 55 Cal.Rptr.2d 771, 920 P.2d 716, recognizing the state's interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of the proceedings.) Further, "[t]he goal of dependency proceedings, both trial and appellate, is to safeguard the welfare of California's children. `The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] These proceedings are `"designed not to prosecute a parent, but to protect the child."' [Citation.] The best interests of the child are paramount. [Citations.]" (In re Josiah Z., supra, 36 Cal.4th at p. 673, 31 Cal.Rptr.3d 472, 115 P.3d 1133.) The interest of the child, therefore, while not necessarily greater than the interest of the parent (see In re Marilyn H. (1993) 5 Cal.4th 295, 309, 19 Cal.Rptr.2d 544, 851 P.2d 826), is a factor to be considered in determining whether due process has been served.
Here, the appointment was made after an informal hearing, by a court that clearly was aware of the circumstances justifying or requiring the appointment of a guardian ad litem, made an inquiry into the need for one, and appointed the guardian ad litem only after satisfying itself the mother *331 would be benefited by the appointment.[6] The mother was present at the hearing, was allowed to respond and agreed the appointment would be beneficial to her. Nonetheless, it is true the mother's agreement to the appointment of the guardian ad litem was secured without a clear explanation to her of the consequences of the appointment.[7] In addition, without reference to the hearsay in the social services report, the record does not establish the mother either lacked the capacity to understand the nature or consequences of the proceeding or was unable to assist counsel in preparation of the case. We have no reason to doubt the trial court in fact found the mother to be incompetent, and we are reluctant to second-guess a court that was perfectly aware of its responsibilities and was able, personally, to observe the mother, and made its decision only after discussing the matter with her. But, in light of the principles discussed in the cited cases, and for purposes of argument, we will accept that the record does not establish the prerequisites for appointment of a guardian ad litem were met, and the appointment therefore was error.
We are not at all certain it follows there was a violation of due process. The appointment had very little impact on the mother's ability to direct or participate in the litigation. It served the interests of the state in promoting the welfare of the child and avoiding the costs and burdens of attempting to litigate with an uncooperative and often absent party. As the child had no significant relationship with the mother, or with the mother's family, the child had little if any interest in prolonging the proceedings on the hope that some relationship with the mother might be created. The child's interest, therefore, also was for a speedy disposition. On balance, due process was served in this case, even if the court erred in appointing the guardian ad litem.
But even if the appointment was erroneous, and even if due process was not served, we cannot agree that the error was structural, requiring reversal without a showing of prejudice. In the context of criminal proceedings, "structural error" involves the basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determining guilt or innocence. (Arizona v. Fulminante (1991) 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302.) Examples include the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial and an erroneous reasonable doubt instruction to the jury. (Id. at pp. 309-310, 111 S.Ct. 1246; and see Enrique G., supra, 140 Cal. App.4th at p. 685, 44 Cal.Rptr.3d 724.)
The appointment did not deprive the mother of notice or of the opportunity to state her case or to make her wishes known to the court. Whenever possible, the guardian ad litem explained things to the mother and presented the mother's position to the court. While it is true the guardian ad litem submitted jurisdiction on the agency's report, she did so only after *332 discussing the situation with the mother and securing the mother's agreement. Disposition also was submitted on the agency's report, but only after the guardian ad litem had made every effort to include the mother in the proceedings. In sum, the record discloses that every reasonable action was taken to protect the rights of a parent who was unwilling or unable to protect her own rights, and that the appointment of the guardian ad litem did not in any way compromise the mother's ability to participate or to present her side of the story. Far from preventing the mother from participating, the appointment was the only thing that gave the mother a presence at the proceedings.
The mother complains of matters such as that the guardian ad litem failed to seek reunification services or demand visitation and waived the mother's right to contest the agency's evidence without obtaining some countervailing and substantial benefit to the mother. It has been held "the guardian may not compromise fundamental rights, including the right to trial, without some countervailing and significant benefit." (Christina B., supra, 19 Cal. App.4th at p. 1454, 23 Cal.Rptr.2d 918.) The holding presumes the existence of something with which to bargain. Here, however, the guardian ad litem had nothing. The court had ruled the mother was not entitled to reunification services. (See § 361.5, subd. (b)(13).) Without input from the mother, the guardian ad litem could state no grounds for resuming visitation. While the mother had the right to a contested hearing, her failure to respond to her attorney or to the guardian ad litem gave them nothing to assert at the hearing. A claim of prejudice cannot be predicated on a failure to mount meritless arguments or make fruitless demands. It also is noteworthy that the mother's complaintthat the guardian did not do enoughis inconsistent with her overall contention that the guardian should not have been appointed at all.
The situation differs from those in cases such as Sara D., supra, 87 Cal.App.4th 661, 104 Cal.Rptr.2d 909 and Joann E., supra, 104 Cal.App.4th 347, 128 Cal. Rptr.2d 189, where there was reason to believe the appointment of the guardian ad litem in some way prevented the parent from presenting evidence.[8] We also respectfully disagree with those courts, and with court in Jessica G., supra, 93 Cal. App.4th 1180, 113 Cal.Rptr.2d 714, to the extent they reason a deprivation of due process may or must be inferred when the guardian ad litem failed to produce evidence helpful to the parent's cause.[9] To *333 presume the existence of such evidence on a silent record is to presume the guardian ad litem disregarded his or her responsibilities, and this we are unwilling to do.[10]
In conclusion, there may be cases in which the appointment of a guardian ad litem has the effect of denying a parent a basic protection, but this is not one of them. The error, if any, was not structural and was harmless beyond a reasonable doubt.

II.-IV.[**]

Conclusion
The order terminating the mother's parental rights and ordering a permanent plan of adoption is affirmed.
We concur: SWAGER, J., and MARGULIES, J.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Background, Section I of the Discussion, and the Conclusion are certified for publication.
[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.
[2] The transcript of the jurisdictional hearing reveals the following, occurring after the mother's attorney represented the guardian ad litem had discussed the report with the mother, that the mother had been informed of her right to contest the report, to cross-examine the agency's witnesses, to bring in her own witnesses and to testify on her own behalf, and that the mother understood she was waiving those rights by submitting the matter on the report:

"[THE COURT]: Okay. [Addressing the mother]: [D]id you hear what [the attorney] had to say?
"[THE MOTHER]: Yeah, I did.
"[THE COURT]: Is that what happened? She did explain all those things to you?
"[THE MOTHER]: She explained the rights basically, but we didn't speak about it too much, but she did kind of explain thatthose pretty much.
"[THE COURT]: Okay. And so you have noyou're agreeing through [the guardian ad litem] to have the court read the report and make its decision on that report?
"[THE MOTHER]: [The guardian ad litem], she's pretty trustworthy and she seems like, yeah, she showed me the report. And I don't agree with most of it, but the last couple pages seem somewhat correct because I'm not putting [the child] up for adoption. And, so, she says all these things are said, but that's just hearsay, that's just what people say, so that's what I'm going by.
"[THE COURT]: Okay. So you feel comfortable doing this?
"[THE MOTHER]: Well I don't know because I'm not real sure if that's exactly what's being done, because maybe they're trying to put her up for adoption or something.
"[THE COURT]: No, no. It's
"[THE MOTHER]: I just want my baby back. I wouldn't have had her if I didn't want her, you know. I've had a lot ofI've had abortions, but i wanted her so it's really difficult for me because it's a lot of pain to go through and to have somebody taken away. And I don't even know. [¶] ... [¶] But, yeah, I pretty much agree with her, because she seems like she knows what she's talking about. I don't know a lot about law, but I'm a hair stylist, I'm a mom and that's all I can say.
"[GUARDIAN AD LITEM]: Your Honor, what might make the record a little more complete is yesterday we met for over two hours. And I actually read the entire report to her. We went over the comments by the social worker, the recommendations by the social worker. We reviewed the prima facie. Her actual disagreements are contained within the body of the report."
[3] The mother sometimes was late and sometimes did not show for scheduled visits. On one occasion she smelled slightly of alcohol, and during the visit became increasingly upset. She responded to efforts to calm her by becoming verbally abusive and using profanity and refused to hand the child back to the social worker until the worker's supervisor threatened to call the sheriff's department. On another occasion, the mother called the social worker several times, highly agitated because a visit had been cancelled because of a county holiday. An attempt to reschedule the visit failed when it turned out the foster mother had a medical appointment for the same time. The mother's agitation increased during the course of the phone calls, and the social worker terminated two of the calls as the mother had become verbally abusive towards her. Visitation was terminated a few days later after the mother had been observed drinking a beverage out of a paper bag in the parking lot and smelled of alcohol. She became agitated and hostile, yelling at the social workers and security. The agency canceled the visit scheduled for that day. It was decided visitation should be suspended until the agency's safety concerns could be met. The social worker left a detailed telephone message for the mother. Later, when she attempted to speak with the mother in person, the mother refused to discuss the matter and ran from the building.
[4] A little over one month after the dispositional hearing, the mother, acting in pro per, filed a writ petition, asking that the order setting the matter for the section 366.26 hearing be vacated, also asking for reunification services and to be given custody of the child. The mother's petition stated no grounds for relief and this court summarily denied the petition. It need not be decided here whether the mother's petition adequately raised an issue as to the appointment of the guardian ad litem, as under the cited authorities, the issue is not waived by the failure to seek review by extraordinary writ.
[5] The Supreme Court recently granted review in In re James F., review granted March 28, 2007, S150316, for purposes of deciding the proper standard of review for the erroneous appointment of a guardian ad litem in a juvenile dependency case.
[6] Contrast Enrique G., supra, 140 Cal.App.4th at p. 684, 44 Cal.Rptr.3d 724; Daniel S., supra, 115 Cal.App.4th at p. 912, 9 Cal. Rptr.3d 646; Jessica G., supra, 93 Cal.App.4th at pp. 1188-1189, 113 Cal.Rptr.2d 714; Sara D., supra, 87 Cal.App.4th at pp. 664, 672-673, 104 Cal.Rptr.2d 909.
[7] Of course, the claim that the mother did not understand the consequences of the appointment tends to undermine any claim that her later failures to participate in the proceedings were based on a belief she had no control over the proceedings.
[8] In Sara D., before the appointment of the guardian ad litem, the mother's attorney indicated three witnesses would appear on the mother's behalf at the jurisdictional hearing. After the appointment, the guardian ad litem and the mother's attorney submitted to jurisdiction without calling the witnesses. (Sara D., supra, 87 Cal.App.4th at p. 673, 104 Cal. Rptr.2d 909.) In Joann E., the record suggested the mother had a number of people whom she believed to be helpful witnesses, but after the appointment of the guardian ad litem, none of these people were subpoenaed and none testified. (Joann E., supra, 104 Cal.App.4th at p. 360, 128 Cal.Rptr.2d 189.) The courts in each case expressed concern that the appointment of the guardians ad litem had in some way deprived the parents of evidence that might have been of aid to them. (Sara D., supra, at p. 673, 104 Cal.Rptr.2d 909; Joann E., supra, at p. 360, 128 Cal. Rptr.2d 189.) Here, the only "evidence" the guardian did not present was whatever was contained in the notes delivered to the guardian ad litem by the mother's friend, Ron. Without more, we will not presume the notes contained anything helpful to the mother's case.
[9] In finding the appointment of a guardian ad litem was not harmless beyond a reasonable doubt, the court in Jessica G. held, "We do not know what Mother might have done or suggested to her attorney if the guardian ad litem had not been interposed. She may have had supportive witnesses to testify about her performance at programs and in support of a continued relationship with her daughters ... or she may have suggested that she finally had rid of herself of [an abusive boyfriend] and experienced an improvement in her psychological prospects as a result; and she may have been able to suggest other evidence or leads. Or she may not have been able to offer anything helpful. We simply do not know." (Jessica G., supra, 93 Cal.App.4th at p. 1189, 113 Cal.Rptr.2d 714.)
[10] If such evidence exists, and if the guardian ad litem in fact violated his or her duties by failing to obtain or produce it, there are grounds for attacking the proceedings either by way of a direct appeal where the evidence appears in the appellate record, or by way of extraordinary writ where it does not.
[**] See footnote *, ante.