Filed 9/11/14  In re J.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065748 |
| Plaintiff and Respondent, | (Super. Ct. No. J518486A, B, C) |
| v. | |
| P.S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

P.S. (the mother) appeals orders of the juvenile court terminating her parental rights to her children, J.P., R.P. and C.P., under Welfare and Institutions Code section 366.26. (All further statutory references are to the Welfare and Institutions Code.)  P.S. contends

that the juvenile court prejudicially erred in appointing a guardian ad litem for her because (1) it did so in violation of her due process rights and (2) there was insufficient evidence to establish the need for a guardian ad litem.  We disagree and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2012, the San Diego Health & Human Services Agency (the Agency) received a referral for abuse and neglect relating to three-year-old J.P., two-year-old R.P. and eight-month-old C.P.  The children's father had taken the mother to an emergency room at the University of California, San Diego (UCSD), and reported that she had been acting strangely for two days and exhibiting "bizarre" behavior characterized by agitation, screaming and paranoia.  The mother was voluntarily admitted to the hospital for stabilization, although hospital staff indicated that she would have been placed on an involuntary hold for grave disability if she had resisted voluntary admission at that time. During her hospitalization, the mother had a positive toxicology test for methamphetamine and was diagnosed with psychosis not otherwise specified, possibly caused by drug use, anxiety not otherwise specified and amphetamine dependence.  The Agency established a voluntary services plan for the family.

The mother was released from UCSD the following month, and was transferred to Rosecrans County Mental Health Hospital (Rosecrans), where she was prescribed medication for anxiety and insomnia.  Upon her release from Rosecrans, the mother entered a residential drug treatment program at KIVA, but dropped out of the program a short time later.  In April 2012, the mother was arrested and the children's father was deported as a result of an incident in which the father hit the mother and she struck him with her high heeled shoe.  The mother's social worker lost contact with her for a period of

2

time, until the mother voluntarily entered the Family Resource Center for drug treatment in July 2012. At that time, J.P. and R.P. were in the care of their parental grandparents.

By early August 2012, the mother was discharged from drug treatment for "non-compliance and not stabilizing her mental health issues." A few days later, she took R.P. to a UCSD emergency room. Medical staff found that there was nothing wrong with R.P., but observed that the mother was exhibiting psychotic symptoms. A hospital psychiatrist concluded that the mother's condition rendered her unable to care for her children and J.P. and R.P. were taken to Polinsky Children's Center.

Upon her release from the hospital, the mother exhibited "considerably" improved cognitive function, although the treating staff was not sure whether that was a result of the administration of antipsychotic drugs or the mother's having gotten appropriate rest during her stay. The mother was again admitted to a residential treatment program, although she again dropped out to "stabilize her mental health."

In September 2012, the Agency filed a dependency petition on behalf of J.P. and R.P., based on the mother's mental health issues (including psychosis and paranoia) and her abuse of cocaine, methamphetamine and alcohol.[1] The juvenile court found the petition's allegations true, placed J.P. and R.P. in a foster home and ordered reunification services for the parents.

In October 2012, the mother entered KIVA, but left later that same month. She also succeeded in convincing police to remove C.P. from the parental grandparents' care based on false information that she provided. When the Agency discovered what the mother had done, it filed a dependency petition on C.P.'s behalf and placed her in a confidential foster

---

[1] C.P. was being cared for by her paternal grandparents. For that reason, the Agency did not initially file a petition on her behalf.

3

home. The mother continued to be unsuccessful with residential drug treatment and the Agency expressed its continuing concern about her untreated mental health issues. At the six-month review hearing for J.P. and R.P., the court ordered continued reunification services.

In March 2013, the mother underwent a psychological evaluation. She was symptom free at that time and the evaluator concluded that she likely suffered from substance-induced psychotic disorder, although he acknowledged that the severity and duration of her earlier psychotic episodes "exceeded what would be expected solely from methamphetamine intoxication." He recognized that the mother showed additional symptoms separate from the psychotic episodes, including anger, irritability, anxiety, rapid mood change, lying to cover negative behaviors, periodic loss of focus, periodic incoherence and odd behaviors with her children such as petting and hair pulling.

The evaluator opined that although the mother's symptoms might impede her ability to care for her children, those symptoms were not sufficiently severe to prevent her from providing adequate care if she was able to abstain from drug use on a longterm basis. He recommended a follow up psychological evaluation in six months, but did not believe that a psychiatric evaluation was necessary unless the mother later experienced depression or anxiety. The evaluator also stressed the importance of encouraging the mother to take her prescribed anti-psychotic medications if she had another episode.

The mother completed in-patient drug treatment in April 2013, and received referrals to a series of aftercare programs. She was repeatedly unsuccessful in aftercare, however, and failed to submit to drug testing and to participate in therapy. During this same time period, she spent some time with her parents in Tijuana, interspersed with periods of homelessness. She continued to have visits with the children for awhile,

4

although she became more and more inattentive and distracted during the visits. In mid-September 2013, she stopped visiting altogether.

By February 2014, the mother was re-incarcerated. Based on the children's bonds with their paternal grandparents and the parents' failure to comply with their case plans, the Agency recommended the termination of parental rights and adoption for all three children. The father requested that the children be placed for adoption with his parents since he recognized that he was not in a position to care for them.

The court terminated reunification services after finding that the parents had not made substantive progress with their case plans and that there was no substantial probability that the children would be returned to them. The court placed J.P. and R.P. in the home of their parental grandparents, where C.P. was staying, over the mother's objection, and set a section 366.26 hearing for all three children. The mother set the matter for trial on the issue of whether the beneficial parent-child exception to adoption applied.

At the pretrial settlement conference, the mother's counsel, Rommel Cruz, asked the court to conduct an inquiry as to whether a guardian ad litem should be appointed for his client. He reported:

> "In regards to my brief conversation with the mother, I wasn't able to determine whether she was under any medication or anything like that. The conversation didn't really go anywhere. That's just how difficult it was this morning. [¶] I just could not, you know, get anything—anything meaningful with her."

The mother's attorney was concerned because he had not previously had this problem in communicating with the mother.

After inquiring about the mother's mental health history and briefly reviewing her psychological evaluation, the court conducted a hearing, during which the following colloquy occurred:

5

"Court: . . . Good morning. Do you understand why you are here in court with us this morning?

"Mother: No, I don't. I really don't understand why I'm here.

"Court: All right. Do you understand that your children are part of the dependency system?

"Mother: No, I don't—I'm sorry. I don't know what to tell you.

"Court: Okay. Are you taking any medication?

"Mother: No, I'm not taking any medication. Like what's the point of this court? I don't understand.

"Court: Okay. Do you remember being here before?

"Mother: Yes, I do. So what's your point? Get to it, please.

"Court: Sure. The court is here today with you . . . because the social worker and the social service agency has recommended—has suggested to the court that we have a—that we go forward and end your right to be the mother to your children. You have a right to have a hearing for that.

"Mother: Yeah. I'm not going to—I'm not going to end my rights as a parent.

"Court: I'm sorry. I can't hear you.

"Mother: Okay. I'm not going to end my rights. I don't know what to tell you.

"Court: Okay. Do you know that you have an attorney who represents you?

"Mother: Yes, I do.

"Court: Okay. And that's Mr. Cruz. Do you understand that we have a trial set for March 18th?

"Mother: Okay.

"Court: Did you know that?

"Mother: No, I don't.

"Court: Okay.

"Mother: I just want to get my kids back. I'm supposed to get out today and just get my kids. I'm not really playing this anymore.

"Court: You're not really what?

"Mother: I'm not doing this anymore.

"Court: Okay.

"Mother: I don't know what the parents—whatever—I don't know.

"Court: Okay.

"Mother: It's been too long for this.

"Court: Do you understand Mr. Cruz has asked the court to appoint someone to stand in your shoes to help the court make decisions about and help Mr. Cruz make decisions about how we should go forward and what we should do in this legal proceeding in the court? Do you understand that?

"Mother: Yeah, I understand.

"Court: He's asked the court to decide if we should appoint someone called a guardian ad litem for you. Do you understand that?

"Mother: Yeah. I understand.

"Court: Do you understand what the issues are as to why the Agency has recommended that your children be placed or that we terminate your parental rights? Do you understand why the Agency has asked the court to do that?

"Mother: No, I haven't. I don't understand why it is.

"Court: Do you understand why the court and the Agency are involved here?

"Mother: No. I don't know why I did all this. It's too much. Taking up all my life for a little court, all this. It's just not happening. Handcuffs, buses, buildings. No. It's too much, taking up all my energy, all my life. I have been spraying things while he's talking to me. He's just doubling up, doubling up. . . . I can't see good. Start building stuff. Buildings, buildings, and handcuffs and handcuffs, chairs and

7

stuff just for one court for my kids. They're my kids. You know, it's unnecessary. This whole building is unnecessary. Cars, the building, just for one right. I'm not going to do this."

Following this discussion, the court appointed a guardian ad litem for the mother. The mother addressed the court saying, "What time—I just want my kids. I want to go home. I don't want to go through all this. Can you take the handcuffs off?" The court responded that the guardian ad litem would talk with the mother further. The mother replied, "I don't want to talk. I want to take the handcuffs so I can put everything back together, so that you guys can stop having back and forth here. There's nothing to talk about. I don't want to go through this anymore."

The court directed that the guardian ad litem or Mr. Cruz try to explain to the mother that she had a right to contest the appointment and to have a hearing to establish that she did not need a guardian ad litem. When the court continued the trial date so that the guardian ad litem could review the file, the mother indicated that she was "not coming back to no court." The court asked the Agency and counsel whether the mother could immediately participate in a psychiatric evaluation or medication evaluation while in custody and requested that the Agency set up visits for her in accordance with the rules of her facility.

At the contested section 366.26 hearing, the mother appeared with her counsel and the guardian ad litem. At the outset of the trial, the mother interrupted the proceedings, saying "Can I say something, lawyer—attorney—judge. I'm not going back to jail. I have no reason to be in jail. I [have] been held hostage for four months." Despite the court's efforts to explain the purpose of the hearing, the mother continued to interject, claiming "This is my father's courthouse. . . . This is my courthouse. . . . Just give me back my kids and take the handcuffs off and let me go home. . . ." The mother's counsel informed the

8

court that when the guardian ad litem had met with the mother the previous week to explain the purpose of the hearing and the issues involved, "It was not a very fruitful meeting . . . ."

The mother interrupted the proceedings a second time, after which the court warned her that continued interruptions would result in her being removed from the hearing; after that warning, the mother quieted down and the court was able to proceed with the trial.

The mother's counsel argued that the court should not find the children adoptable because his client objected to the children's placement with their paternal grandparents and because the beneficial parent-child relationship exception to adoption applied. The Agency, joined by minors' and father's counsel, argued that there was no evidence to support the application of the beneficial relationship exception. The court found the children adoptable and terminated parental rights. The mother appeals.

## DISCUSSION

A parent who is not mentally competent must appear in juvenile dependency proceedings through a guardian ad litem. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 665.) The test for incompetence in that context is whether the party has the capacity to understand the nature or consequences of the proceedings and is able to assist counsel in representing his or her interests. (*In re Christina B.* (1993) 19 Cal.App.4th 1441, 1450-1451.) If the court concludes that the parent is not competent and makes an appointment, the guardian ad litem is afforded the power to control the litigation of the action on behalf of the affected parent. (*In re Sara D.*, at p. 668.) For this reason, the parent "has a direct and substantial interest in whether a guardian ad litem is appointed." (*Ibid.*)

9

Unless the parent consents to the appointment of a guardian ad litem, due process considerations require the juvenile court to hold an informal hearing and give the parent the opportunity to be heard before making an appointment. (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 663.) At the hearing, the court or counsel must explain to the parent the purpose of the guardian ad litem and the grounds for believing that one is necessary, and a parent who opposes the appointment must have the opportunity to try to persuade the court that the appointment is not necessary. (*Id*. at pp. 671-672.)

1. *Due Process*

The mother contends that the juvenile court violated her due process rights in appointing a guardian ad litem for her because (a) she was not given proper notice that an appointment would be sought; (b) neither the court nor counsel fully explained to her the purpose of the appointment, the authority that would be granted to the guardian ad litem or why the appointment was believed to be necessary; and (c) she never had the opportunity to contest the appointment. These arguments are unavailing.[2]

"The circumstances under which appointment of a guardian ad litem for a parent in a dependency proceeding may occur may vary widely from case to case" and thus there is no one-size-fits-all rule regarding how the parent must be notified of, and given the opportunity to respond to, the possibility that a guardian ad litem may be appointed to act on her behalf. (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 671.) When the issue of the

---

[2]    In the mother's reply brief, mother's counsel complains that the respondent is erroneously attempting to shift the burden to her to establish that her due process rights were violated and that there was no substantial evidence to support the appointment of a guardian. This argument appears to reflect a misperception about the nature of appellate review. A fundamental tenet of appellate law is that a challenged superior court judgment or order is generally presumed to be correct and thus, an appellant bears the burden of establishing error and prejudice. (See, e.g., *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 419-420; generally *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

10

mother's competence was brought to the court's attention, the court conducted an informal hearing during which it inquired of the mother and her counsel as to the mother's understanding of the proceedings. The mother had the opportunity to, and did in fact, address the court at that hearing. The court asked the mother whether she understood the purpose of a section 366.26 hearing and, after the mother gave a series of responses that indicated a lack of comprehension, the court asked the mother whether she understood that her counsel had asked the court to determine whether she needed a guardian ad litem to protect her interests.[3] After appointing the guardian ad litem, the court continued the trial, and instructed the mother's counsel and the guardian ad litem to explain the circumstances to the mother, and to further explain to her that she had the right to challenge the appointment.

Under the circumstances, we conclude that the juvenile court did not violate the mother's due process rights in appointing the guardian ad litem for her. (See generally *In re James F.* (2008) 42 Cal.4th 901, 910-911; *In re Daniel S.* (2004) 115 Cal.App.4th 903, 912.)

2.      *Sufficiency of the Evidence*

The mother also contends that there was not substantial evidence to support the court's decision to appoint a guardian ad litem to act on her behalf. However, the mother's history of mental health problems, her counsel's expression of concern about her competence as a result of his interactions with her, the guardian ad litem's report about her unsuccessful attempt to explain the purpose of the appointment to the mother and the nature of the mother's dialogues with the court during both the hearing at which the

---

[3]      The mother responded that she did understand.

11

guardian ad litem was appointed and the continued trial hearing amply supported the juvenile court's conclusion that the mother did not fully understand the nature or consequences of the proceedings and was unable to assist counsel in representing her interests in those proceedings. (*In re Christina B.*, *supra*, 19 Cal.App.4th at pp. 1450-451.) On this record, the juvenile court did not err in appointing a guardian ad litem to protect the mother's interests in the proceedings.[4]

DISPOSITION

The orders are affirmed.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

IRION, J.

---

[4] Even if the court had erred in appointing a guardian ad litem, the error would have been harmless beyond a reasonable doubt. During the course of the proceedings, the mother maintained only sporadic visitation with the children and, although she had a loving relationship with them, they did not look to her for their care and protection. Thus, there was no basis on which the juvenile court could conclude that the nature of her relationship with the children promoted their well-being to such a degree as to outweigh the benefit to them of being placed for adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Although the mother speculates the result of the hearing might have been different if she had testified, the appointment of the guardian ad litem did not preclude her from testifying. Further, the mother makes no proffer as to what testimony she would or could have given to accomplish that end. On this record, there is no possibility that the mother would have achieved a more favorable outcome if the guardian ad litem had not been appointed. (*In re James F.*, *supra*, 42 Cal.4th at pp. 918-919; *In re Enrique G.* (2006) 140 Cal.App.4th 676, 684.)