Filed 4/28/22  P. v. Phenneger CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL PHENNEGER,<br><br>Defendant and Appellant. | F078550<br><br>(Super. Ct. Nos. 15CM-1278, 15CM-3557E, 15CMS-0662, 15CMS-0679)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert S. Burns, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2017, appellant Michael Phenneger and two codefendants were tried for the 2014 stabbing death of Roman Aguayo. The jury was unable to reach a verdict and a mistrial was declared. In 2018, appellant was tried alone and a second jury convicted him of first degree murder (Pen. Code, § 187, subd. (a);[1] count 1), finding true that this crime was committed with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). The jury also convicted appellant of active participation in a criminal street gang (§ 186.22, subd. (a); count 2).

Appellant, who was born in 1996, was 17 years old when this homicide occurred. He received an indeterminate prison term of 25 years to life.[2] This sentence was consolidated with sentencing in three other unrelated criminal matters, all of which appellant had resolved through plea agreements.[3] He received an aggregate determinate prison term of seven years eight months, and a consecutive aggregate indeterminate prison term of 32 years to life.

In the present appeal, appellant seeks reversal of his convictions based on alleged instructional errors and cumulative error. He also contends a limited remand is necessary for a *Franklin* proceeding.[4] We reject his arguments. However, following the passage of

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     In count 2, appellant received a middle term sentence of two years for active participation in a criminal street gang, which was stayed pursuant to section 654. Likewise, the sentence for the gang enhancement found true in count 1 was stayed.

[3]     In Kings County Superior Court case No. 15CMS-0662, appellant received a consecutive indeterminate prison sentence of seven years to life for attempted murder. In Kings County Superior Court case No. 15CM-3557E, he received a consecutive full determinate prison term of two years for assault with a deadly weapon, with an additional five years for a gang enhancement. Finally, in Kings County Superior Court case No. 15CMS-0679, he received a one-third consecutive determinate prison term of eight months for active participation in a criminal street gang.

[4]     *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

Assembly Bill No. 333 (2021-2022 Reg. Sess.), the parties agree via supplemental briefing that the true finding regarding the gang enhancement in count 1 must be reversed, along with the conviction in count 2 for active gang participation. We agree. The gang enhancement in count 1 and the conviction in count 2 were based on a trial stipulation that did not take into account the change in law brought about by Assembly Bill No. 333. We reverse but give the People the opportunity to retry the gang enhancement allegation in count 1 and the gang participation charge in count 2. We otherwise affirm the judgment but do so without prejudice to appellant filing a motion for a *Franklin* proceeding under the authority of section 1203.01 and *In re Cook* (2019) 7 Cal.5th 439 (*Cook*).)

## BACKGROUND

We summarize the relevant procedural history of this matter. We also provide the material facts from the second trial that support appellant's judgment and which are relevant to the issues raised in this appeal.

## I.     The First Trial That Resulted in a Hung Jury.

In 2017, appellant was tried for the 2014 murder of Roman Aguayo. Brothers Jesus and Ismael Reyes were codefendants with appellant in the first trial. The prosecution argued that all three of them had attacked Aguayo and stabbed him to death. In October 2017, the jury was unable to reach a verdict and a mistrial was declared.

In April 2018, the trial court severed appellant from the Reyes brothers. The severance occurred because the prosecution had announced it had a new witness, Sergio Ferretiz, who would testify against appellant in the second trial as an in-custody informant. It was anticipated that Ferretiz would testify that appellant had admitted participating in Aguayo's murder. Appellant's second trial commenced in October 2018, and he was tried alone.

3.

## II.    An Overview of the Second Trial.

At the second trial, it was undisputed that Aguayo had been stabbed to death.  It was also undisputed that three males had attacked Aguayo.  The only contested issue was whether or not appellant was one of the three assailants.

No forensic evidence linked appellant to this murder.  He claimed in closing argument that he was not involved at all in this crime.  The prosecution, however, had presented two witnesses who established appellant's guilt for this murder.  Rodolfo Ramirez, an eyewitness to this attack, positively identified appellant at trial as one of the three assailants who had attacked Aguayo.  Ramirez's testimony, however, had substantial credibility issues based on numerous prior inconsistencies and admitted lies to law enforcement.  In addition to Ramirez's eyewitness testimony, the prosecution presented Ferretiz (the in-custody informant), who testified that appellant had admitted to him that he had been involved in this murder.

Aguayo's girlfriend, E.F., was also an important witness in this trial.  She saw the fatal attack, and she reported to law enforcement that three male Hispanics were responsible.  At trial, however, E.F. was unable to identify appellant as one of the three assailants.

## III.    Appellant Was Involved in this Fatal Attack.

Aguayo was stabbed to death on November 20, 2014, outside an apartment complex in Hanford, California.  Aguayo's girlfriend, E.F., was present when the fatal incident occurred.  Ramirez, who lived at this apartment complex, was also present.[5] Ramirez knew Aguayo because they had worked together at a meat company.

Just prior to the fatal attack, Aguayo and E.F. had gone on a walk together.  They lived near this apartment complex.  Near the apartment complex, they saw Ramirez outside, and Aguayo and Ramirez greeted each other and acted friendly.  After the two

---

[5]    The jury learned that Jesus Reyes also lived in this apartment complex.

4.

men stopped talking, Aguayo and E.F. walked closer to the apartments. It was then when three males began walking towards them.

The prosecution presented evidence that suggested Aguayo was a former gang member who had dropped out. It was the prosecution's theory that the three males had attacked Aguayo for this reason. E.F. told the jury that before the three males attacked Aguayo one of them had asked him if he "banged anything" or " 'do you bang' " or words to that effect. Aguayo had answered that "he didn't do none of that stuff." An assailant responded that he had "heard different." This assailant pushed Aguayo, who pushed him back. The assailant fell down. The other two assailants began to punch Aguayo, and the third assailant got up and joined in the attack. Aguayo was not fighting back.[6]

According to E.F., all three males punched Aguayo with their fists. She never saw a weapon. Aguayo fell to the ground. Before the assailants fled, one of them kicked Aguayo's head.

Ramirez testified at trial that he saw the three assailants confront Aguayo. The encounter turned violent and Ramirez saw the three assailants hitting Aguayo on his head and his face, but Ramirez did not see a weapon. Aguayo fell to the ground and the three males began to kick his head.

At trial, Ramirez testified that he had tried to protect Aguayo during the fatal attack, and he had tried to shield Aguayo by getting on all fours over Aguayo's body while the three assailants were kicking him. He said he put his "torso" over Aguayo.

At some point after the assailants fled, Ramirez called 9-1-1 to report this attack. E.F. separately ran to an apartment and she asked its occupant to call 9-1-1. Emergency personnel responded a short time later, and they found Aguayo in critical condition. When medical emergency personnel cut open his shirt, his intestines were seen

---

[6]    Aguayo's blood-alcohol level was 0.22 percent when this fatal attack occurred.

5.

protruding from his lower abdomen. Aguayo was transported to a hospital, but he died from injuries he sustained during this attack.

At trial, Ramirez testified that he was familiar with all three assailants. He told the jury that, before this fatal incident occurred, he had smoked marijuana with them on different occasions. Ramirez believed he had smoked with appellant maybe "once" or "twice," but he had not known appellant's name. However, Ramirez knew the other two males, Jesus and Ismael Reyes.

Ramirez told the jury that appellant had been one of the three assailants who had attacked Aguayo, including kicking him after he had fallen down. Ramirez testified he was "one hundred percent sure" of his identification of appellant as one of the three males who had beaten Aguayo.

## IV. Aguayo Died from Multiple Stab Wounds.

Although neither Ramirez nor E.F. saw the three males attack Aguayo with weapons, it was undisputed that at least one of them, and perhaps more, had stabbed Aguayo with knives during this encounter. The pathologist found 11 stab wounds to Aguayo's body. Two stab wounds to the chest were fatal. Based on the nature of some of the wounds, the pathologist opined it was reasonable to assume that two different knives had been used to stab Aguayo.[7]

## V. Ramirez's Credibility Was Impeached in Numerous Ways at Trial.

At trial, the credibility of Ramirez, the eyewitness who identified appellant as the third assailant, was impeached in multiple ways. We provide a summary of the various concerns.

---

**7** During closing argument, the prosecutor informed the jury it was possible to infer that all three assailants had used knives during this attack.

## A. Ramirez was a gang member from Avenal.

Ramirez admitted to the jury that he was a Norteño gang member from Avenal. When living there he had belonged to the "Avenal Varrio Lomas" gang, which is known as "AVL." He told the jury he had moved to Hanford with his wife and child because he had wanted a "fresh start." He admitted at trial that, when he was an active Norteño gang member, he would get into fights.

After moving to Hanford, Ramirez, had not wanted people to know that he had stopped living a gang lifestyle so that he could avoid being injured. He never told anyone that he was no longer active in the gang because he feared retaliation.

## B. Ramirez tried to create an alibi for himself.

Ramirez tried to create an alibi for himself for the night Aguayo was attacked. He had asked his grandmother to tell people that he was not home when this happened because he did not want anything to do with this incident.

## C. Ramirez had blood on his clothes and he was initially a suspect in this murder.

Law enforcement initially viewed Ramirez as a potential suspect. The day after this fatal attack, a detective went to Ramirez's residence. Outside Ramirez's apartment, a "small amount" of blood was observed on the front door. Law enforcement searched Ramirez's apartment. Other than standard kitchen knives, no weapons were located. However, police found a jacket, shirt and pants that had blood on them. At trial, a detective denied that the clothes recovered from Ramirez's apartment were "covered" in blood. Instead, the detective generally testified that small amounts of blood were found at various locations on these articles of clothing.

Based on law enforcement's body camera footage from the night in question, the detective confirmed that Ramirez had been wearing the same jacket on the night Aguayo was attacked. The detective told the jury that, when initially investigating this homicide, he discovered that a person named "Rodolfo Ramirez" had called 9-1-1 on the night of

7.

the incident about a minute and a half after an initial caller. The detective found that significant because a perpetrator does not usually call 9-1-1 on themselves. The detective also saw that Ramirez had remained at the crime scene while Aguayo was still alive as seen on body camera footage.

At trial, E.F. denied that the three assailants had looked like Ramirez. At trial, she could not remember seeing Ramirez while Aguayo was being attacked. She denied at trial that Ramirez had inflicted the injuries on Aguayo.

Ramirez testified it was possible his leg had touched Aguayo, but Ramirez could not remember. At trial, Ramirez denied that he had ever kicked Aguayo.

### D.    *Ramirez initially lied to law enforcement.*

Ramirez repeatedly lied to law enforcement about his knowledge of this fatal incident. In his 9-1-1 call, Ramirez had told the dispatcher that he had not seen the attackers. He claimed at trial that he had lied because he "knew the consequences." He told the jury that by calling 9-1-1 he had snitched on the gang and he could be killed.[8]

Ramirez spoke with law enforcement about a day after this fatal incident. He did not immediately disclose what he had witnessed that night. He repeatedly told the detectives that he did not know what had happened. He also claimed to not have been at the scene. He initially denied knowing Aguayo. He erroneously informed the detectives that Aguayo had been coughing up blood, which was why Ramirez had blood on his clothes. At trial he admitted that he had lied to law enforcement, claiming he had feared for his life and for his family. He testified that he began to cooperate with law enforcement once he learned that Aguayo had died.

---

[8]    Since working with law enforcement in this matter, Ramirez had been placed in witness protection. At the time of trial, he no longer lived in the county and he had relocated his family. He told the jury that the purpose of relocating was to prevent his own murder, or that of his wife or child. The jury learned that, since assisting law enforcement, a warrant had been removed that had previously been issued against Ramirez for a suspended license.

**E.      *Ramirez was not very certain in his initial photographic identification of appellant.***

At trial, Ramirez was "one hundred percent sure" and "[v]ery confident" that appellant was one of the three people involved in this murder. With law enforcement before trial, however, Ramirez had been shown a number of photographs of potential suspects. One picture showed six individuals and Ramirez picked out appellant. He had told law enforcement he was only 45 to 50 percent certain of his identification.[9] Later, however, Ramirez selected a different photograph of appellant and Ramirez told law enforcement that he was very certain of his identification. He told the jury that he was better able to identify appellant in the second photo because it had a "much clearer image."

**F.      *Ramirez made many inconsistent statements.***

The jury learned that Ramirez had provided numerous prior inconsistent statements. The following are some of the examples.

Ramirez had previously stated all three assailants were Hispanic. However, at trial Ramirez admitted that appellant appears "light complected" and does not look Hispanic. Ramirez also admitted that, during his grand jury testimony[10] and his testimony at the preliminary hearing, he had never mentioned smoking marijuana with appellant in the Reyes residence. At trial, he admitted that this was new information.

At the preliminary hearing, Ramirez was asked if he remembered any tattoos on the third assailant (i.e., appellant) and Ramirez had answered no. At trial, however, Ramirez acknowledged that appellant has tattoos. At the preliminary hearing, Ramirez

---

**9**      Ramirez testified that he knows Ismael Reyes is the brother of Jesus Reyes. With law enforcement before trial, Ramirez identified Jesus in a photograph but he indicated at that time that he was only about 45 to 50 percent certain.

**10**      This criminal matter was initiated with an indictment wherein the grand jury of Kings County accused appellant of first degree murder (count 1), and active participation in a criminal street gang (count 2). This indictment was filed following testimony in front of the grand jury.

had stated he would not be able to recognize appellant if he had been in the courtroom. At trial, Ramirez agreed he had been "guessing" regarding this issue during his preliminary hearing testimony.

At trial, Ramirez acknowledged that he had indicated at the preliminary hearing that he would not recognize the face of the third assailant because a beanie had been covering "part of his face" and he only "partially" saw that male. Ramirez testified at trial that he could see appellant's face better in court than on the night of the murder because it had been dark then.

## VI. Ferretiz's Trial Testimony.

Ferretiz, the in-custody informant, testified during the second trial that he had been housed in the local jail for about 14 months. According to Ferretiz, he was a former "Northerner" gang member from Avenal.[11] After leaving the gang in 2017, he went through a debriefing process with law enforcement in the hopes of receiving leniency. He told law enforcement about certain crimes, including matters involving appellant.

Prior to his testimony in this matter, Ferretiz had signed a plea agreement with the prosecutor's office. Ferretiz admitted to the jury that he was hoping for leniency in his criminal sentencing which was occurring in a few weeks.[12]

At trial, Ferretiz identified appellant as someone he had known from his time as a member in the gang. Ferretiz claimed to have known appellant since around 2012 or 2013. Ferretiz described appellant as a "regular soldier, just like all of us. Just a regular gang banger."

---

[11] Ferretiz had belonged to a different Norteño gang than appellant's gang. Appellant was involved in a Norteño gang from Hanford.

[12] Ferretiz was in custody for being a felon in possession of a firearm and a felon in possession of ammunition. He had previously been convicted of active participation in a street gang. Ferretiz's pending charges subjected him to a sentence of about eight years in prison.

In 2015, Ferretiz was arrested for possession of a firearm. While in custody he saw appellant and they spoke. According to Ferretiz, appellant did not understand why his bail had been increased. Appellant was concerned that he was being charged with either attempted murder or murder, and the Reyes brothers were involved. Ferretiz told the jury that he knew the Reyes brothers from juvenile hall, and he knew the older brother's name (Jesus), but he did not know the other brother.

During his debriefing with law enforcement, Ferretiz informed a detective that appellant had said "he plugged" Aguayo. Ferretiz also told a detective that according to appellant, the Reyes brothers were not doing anything but "stomping him" and that is when appellant "plugged him." At trial, Ferretiz testified that appellant said he had been with the Reyes brothers when this murder occurred. Appellant had said either "they plugged him or [appellant] plugged him." Ferretiz told the jury that the word " 'plug' " means to stab someone.[13]

In addition to this murder, Ferretiz also told the jury that appellant had discussed an attempted murder, something about "shooting somebody in the leg." In this other unrelated crime conveyed to Ferretiz, appellant had evaded police with another person. Appellant said he ran and jumped a few fences until they caught him. Appellant said something about a gun that had been modified. Appellant had told Ferretiz that he had hidden a revolver in "a little tree" around the time he had evaded police. According to Ferretiz, appellant had hidden the gun "in, like, somebody's backyard, in a plant or something like that."

## VII. Evidence Corroborated Portions of Ferretiz's Testimony.

At trial, evidence was introduced that corroborated key portions of Ferretiz's testimony. The jury learned that Ferretiz and appellant had both been in custody at the local jail at the same time. They had been housed in the same pod.

---

[13] Ferretiz admitted at trial that he had seen a newspaper story about this murder.

11.

The prosecution established that, in March 2015, appellant had shot a victim in his leg. That victim told this jury that he had almost bled to death. The jury learned that, in March 2015, law enforcement had chased appellant. Appellant had jumped over a fence and he ran through a homeowner's backyard. Appellant had been arrested a short distance away. The homeowner found a gun in her backyard near a sago palm tree. In or about April 2015, she contacted law enforcement, who collected a .357 revolver.[14] The homeowner later noticed that a lot of the palm fronds had been torn off that tree and were lying in the planter.

Finally, and as reported above, Ramirez identified appellant in court as one of the three assailants who committed the attack that caused Aguayo's death.

## VIII. The Gang Evidence.

At trial, the prosecution established that appellant and Jesus Reyes are gang members in the South Side Locs (SSL), which is a Norteño gang in Kings County and Hanford. The parties stipulated that SSL is a criminal street gang.

The prosecution's gang expert was given a hypothetical that mirrored certain facts in this matter. The gang expert opined that this murder was done to benefit SSL.

## DISCUSSION

### I. Appellant Has Forfeited His Claim that the Trial Court Violated His Constitutional Rights by Instructing the Jurors with CALCRIM No. 315; In Any Event, No Error Occurred and Any Presumed Error Was Harmless.

Appellant asserts that the trial court violated his due process rights by instructing the jurors with CALCRIM No. 315. In relevant part, the court told the jurors that, in evaluating Ramirez's credibility as an eyewitness who identified appellant, they should

---

[14] The parties stipulated that the .357 revolver recovered from the homeowner's backyard was not the same gun that was used to shoot the victim in appellant's other criminal matter involving the attempted murder.

12.

consider certain questions, including: "How certain was the witness when he or she made an identification?"

Appellant contends that this "certainty" instruction runs counter to prevailing social science and research, which establishes that eyewitness certainty does not correspond to accuracy. He argues that this instruction reduced the state's burden of proof and undercut his right to present a defense. He maintains that reversal is required because the prosecutor relied heavily on Ramirez's trial testimony where he identified appellant as the third assailant and he was 100 percent certain of his identification that appellant was involved in this murder.

Our Supreme Court has recently addressed this issue. In *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), the high court considered whether the "certainty" instruction violates due process. Based on the context of its trial record as a whole, which included an eyewitness identification expert who testified for the defense, the *Lemcke* court held that due process was not violated. According to *Lemcke*, the certainty factor did not render the defendant's trial fundamentally unfair. (*Id.* at p. 646.) However, the Supreme Court agreed that, despite the absence of a constitutional violation, a "reevaluation of the certainty instruction" was warranted. (*Id.* at p. 647.) *Lemcke* concluded that "near unanimity in the empirical research" now exists that " 'eyewitness confidence is generally an unreliable indicator of accuracy.' [Citations.]" (*Ibid.*) The high court noted that, based on many studies, "eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an identification." (*Ibid.*) In light of these concerns, the Supreme Court referred the matter to the Judicial Council of California and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how this instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy. (*Ibid.*) In addition, the *Lemcke* court directed trial courts to omit the certainty factor from CALCRIM No. 315 (unless a

defendant requests otherwise) until the Judicial Council has completed its evaluation. (*Id.* at pp. 647–648.)

After *Lemcke* was issued, the parties filed supplemental briefs in this matter. They both contend that *Lemcke* supports their respective positions. Appellant notes that, unlike what occurred in *Lemcke*, no eyewitness identification expert testified on his behalf in his trial. Appellant argues he should receive retroactive application of *Lemcke*'s pronouncement that the certainty instruction should not be given to jurors.

Respondent does not address the issue of retroactivity. Instead, respondent contends that appellant has forfeited this claim. In the alternative, respondent argues that the certainty instruction given in this matter did not mislead jurors to believe that eyewitness confidence correlates to accuracy. Respondent contends that *Lemcke* establishes that this claim is without merit. Respondent notes that appellant had the opportunity to present an expert witness regarding eyewitness identification. Respondent takes the position that appellant's due process rights were not violated.

We agree with respondent that appellant has forfeited this claim. In the alternative, we also agree that this claim fails on its merits, and we conclude that prejudice did not result from any presumed error. As a result, we need not address the issue of retroactivity.

### A.     *This claim is forfeited.*

It is undisputed that appellant failed to object to the giving of CALCRIM No. 315, and he did not request a modification of it. To overcome forfeiture, appellant cites section 1259 and argues that this claim impacts his substantial rights. (See § 1259 [an appellate court may review any given jury instruction, despite no objection below, if the substantial rights of the defendant are affected].)

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), the defendant had similarly argued that the trial court had erred in instructing jurors with CALJIC No. 2.92 (the

14.

predecessor to CALCRIM No. 315) because there was a weak correlation between certainty and accuracy. (*Sánchez*, *supra*, 63 Cal.4th at p. 461.) The Attorney General raised forfeiture because the defendant had not requested a modification in the trial court. The Supreme Court agreed, explaining a trial court has no sua sponte duty to modify this instruction. (*Ibid.*)

Based on *Sánchez*, we agree with respondent that it is appropriate to invoke the forfeiture doctrine. We further reject appellant's assertion that section 1259 overcomes forfeiture. As we discuss below, appellant's substantial rights were not impacted by the certainty instruction. Thus, this claim is deemed forfeited.[15] In any event, however, this claim also fails on its merits.

### B. Appellant's claim fails on its merits.

In *Lemcke*, the defendant and his girlfriend attacked a woman at a motel. (*Lemcke*, *supra*, 11 Cal.5th at p. 648.) The victim identified the defendant in a photographic lineup later that day, and again approximately three months later. (*Id.* at pp. 648–649.) The defense called an expert witness who testified at length regarding the reliability of eyewitness identifications. (*Id.* at pp. 650–652.) The trial court instructed the jury with CALCRIM No. 315, providing 15 factors the jury should consider when evaluating the credibility and accuracy of eyewitness identification evidence. (*Id.* at p. 652.) On appeal, the defendant argued that the certainty instruction violated his right to due process. (*Id.* at p. 654.)

---

[15] In his reply brief, appellant raises for the first time the possibility of ineffective assistance of counsel as grounds to overcome forfeiture and review this claim. We will not entertain this argument which was made for the first time in the reply brief because it is unfair to the other party. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.) In any event, appellant's assertion of ineffective assistance of counsel also fails because, as we explain below, there was no error and any presumed error was harmless. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436 [a criminal defendant asserting ineffective assistance of counsel has the burden of establishing two elements, deficient performance and prejudice].)

*Lemcke* held that a due process violation occurs if a jury instruction renders a defendant's trial "fundamentally unfair." (*Lemcke*, *supra*, 11 Cal.5th at pp. 646–647.) Our Supreme Court reiterated its belief, based on prior precedent, that the certainty factor contained in CALCRIM No. 315 does not inform a jury "that 'certainty equals accuracy.' " (*Lemcke*, *supra*, 11 Cal.5th at p. 647; citing *Sánchez*, *supra*, 63 Cal.4th at pp. 461–463; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232 [approving CALJIC No. 2.92's certainty instruction].) The high court concluded that, although the language of the disputed instruction "may prompt jurors to conclude that a confident identification is more likely to be accurate," the defendant "was permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated. Moreover, the court provided additional instructions directing the jury that it was required to consider the testimony of the expert witness, that the prosecution retained the burden to prove [the defendant's] identity as the perpetrator beyond a reasonable doubt, and that witnesses sometimes make honest mistakes." (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) The high court found no constitutional violation. (*Ibid.*)

Following *Lemcke*, our high court in *People v. Wright* (2021) 12 Cal.5th 419 (*Wright*) again addressed the concerns associated with a certainty instruction. In *Wright*, no eyewitness identification expert testified for the defense. (*Id.* at p. 453.) However, the defendant's primary trial strategy in *Wright* had been to discredit the eyewitnesses who had testified against him, and "to imply that the eyewitnesses were testifying falsely. At no point did defendant argue that the witnesses mistook his identity. This was in contrast to *Lemcke*, where the defense strategy focused on questioning the victim's identification of the defendant." (*Wright*, *supra*, at p. 453, citing *Lemcke*, *supra*, 11 Cal.5th at pp. 652–653.) The *Wright* court held that *Lemcke* was distinguishable because multiple witnesses had identified the defendant in *Wright* and at least two of the witnesses had known the defendant in some capacity prior to the attack. (*Wright*, *supra*, at p. 453.)

In the present matter, appellant had a full and fair opportunity to challenge the eyewitness identification testimony that was introduced against him. Defense counsel vigorously cross-examined Ramirez regarding his numerous inconsistent statements and his admitted lies to law enforcement. Moreover, defense counsel forcefully argued to the jury that Ramirez lacked any credibility, and counsel summarized numerous reasons why the jury should reject his testimony. Counsel contended that Ramirez was biased and had wanted appellant to be convicted to avoid his own potential liability for this murder.

The defense argued to the jury that it was Ramirez who had participated in killing Aguayo. According to defense counsel, Ramirez had the opportunity and the means to commit this murder. Ramirez had Aguayo's blood on him and Ramirez had kitchen knives in his apartment that law enforcement did not test. Ramirez had lied during the 9-1-1 call about what he had seen. Defense counsel reiterated that Ramirez had created a false alibi for himself, and he continued to change his story about what had transpired. Defense counsel concluded that the evidence pointed to Ramirez's guilt, but the government had refused to deviate from its original theories. The defense asked the jury to acquit appellant of all charges, asserting that the only evidence that pointed to appellant's guilt was from Ramirez, who had repeatedly lied.

Unlike what occurred in *Lemcke*, appellant's defense was not based on an assertion that Ramirez had made a false identification. Instead, appellant attempted to convince the jury that Ramirez had lied. In any event, nothing prevented appellant from calling an expert to testify about the inherent problems associated with eyewitness identifications.

Finally, the jury received other instructions that eliminate any reasonable concerns that the prosecution's burden of proof was lowered or that appellant's due process rights were violated. (See *Lemcke*, *supra*, 11 Cal.5th at pp. 658, 660.) With CALCRIM No. 220, the jurors were informed that appellant was presumed to be innocent and this presumption required the prosecution to prove him guilty beyond a reasonable doubt.

17.

With CALCRIM No. 226, the jurors were told to use their "common sense and experience" when judging a witness's credibility. The jurors were given a list of factors to consider, including how well the witness could perceive the event, the witness's behavior while testifying, and whether the witness made prior inconsistent statements. The jurors were instructed that people sometimes "honestly forget things, or make mistakes about what they remember." The jurors were informed they could accept part of a witness's testimony and reject other parts. Finally, with CALCRIM No. 315, the jurors were given 15 factors to consider when deciding whether Ramirez gave truthful and accurate identification testimony. These factors included the disputed "certainty" question. After listing the factors to consider, this instruction again reiterated that the prosecution bore the burden to prove beyond a reasonable doubt that it was appellant who committed the crime. The jurors were instructed to find appellant not guilty if the People did not meet this burden.

The instructions taken as a whole do not support a conclusion that the jury was encouraged to give undue weight to the disputed certainty factor. To the contrary, the entirety of this trial record demonstrates that the inclusion of the certainty factor did not render appellant's trial fundamentally unfair. This instruction did not lower the prosecution's burden of proof. (See *Lemcke*, *supra*, 11 Cal.5th at p. 657.) Based on *Lemcke* and *Wright*, we reject appellant's claim on its merits. He did not suffer any constitutional violations and reversal is not warranted.

### C. *Any presumed error was harmless.*

Appellant argues that we should analyze prejudice under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under this standard, the reviewing court must determine beyond a reasonable doubt that the alleged error did not contribute to the verdict. (*People v. Aranda* (2012) 55 Cal.4th 342, 367.)

We reject appellant's assertion that *Chapman* is the correct standard of review. The California Supreme Court has used the standard from *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) when analyzing prejudice in this situation. The issue is whether it is reasonably probable appellant would have obtained a more favorable result had the trial court deleted the certainty factor. (*Sánchez, supra*, 63 Cal.4th at p. 463.) Under either standard, however, this record amply demonstrates that no prejudice occurred even if error is presumed.

During closing arguments, the prosecutor informed the jurors that they should convict appellant if they had an "abiding conviction" of his guilt. However, the prosecutor advised the jurors that they should acquit appellant if they did not have such a belief. The prosecutor reminded the jurors that, other than Ferretiz's testimony, the in-custody informant, the evidence of a single witness was sufficient by itself to prove any fact beyond a reasonable doubt. The prosecutor noted that, if the jurors believed Ramirez's trial identification, that was sufficient for a conviction. Later, the prosecutor argued that law enforcement initially showed Ramirez a photo (which the prosecutor described as "fairly blurry") and Ramirez was not certain of his identification. Later, however, Ramirez was shown a better photo. The prosecutor asserted that "now [Ramirez] can conclusively say this is the third person."

During closing arguments, the prosecutor did not place any emphasis on the disputed certainty instruction appearing in CALCRIM No. 315. In addition, this instruction cited the certainty factor in a neutral manner. It merely told the jurors that they should consider it and it did not suggest that certainty equals accuracy. During closing argument, the defense emphasized the numerous concerns surrounding Ramirez's identification of appellant. The defense also suggested that the evidence showed it was Ramirez who was the third assailant, and the defense asked the jury to acquit appellant of all charges.

19.

Based on the verdicts rendered, it is apparent that the jury rejected the defense's position that it was Ramirez who had participated in the fatal attack as the third perpetrator. We note that E.F. denied at trial that the three assailants had looked like Ramirez. She also could not remember seeing Ramirez while Aguayo was being attacked. She denied at trial that Ramirez had inflicted the injuries on Aguayo.

The prosecution also presented the testimony of Ferretiz, who heard appellant talk about participating in this murder. As we explain later in this opinion, Ferretiz's testimony was sufficiently corroborated. Appellant's admission of guilt to Ferretiz was further evidence supporting the jury's murder verdict and it is additional grounds demonstrating that any presumed instructional error was harmless.

Finally, instructing the jury with the certainty factor could only have benefited appellant. Ramirez expressed initial doubt regarding his identification of appellant. Consequently, it is not reasonably probable appellant would have obtained a more favorable result had the trial court deleted the certainty factor. (See *Sánchez*, *supra*, 63 Cal.4th at p. 463.) Likewise, we can also declare beyond a reasonable doubt that the alleged instructional error did not contribute to the verdicts. (See *People v. Aranda*, *supra*, 55 Cal.4th 342, 367.) In other words, the guilty verdicts actually rendered in this trial were surely unattributable to any presumed error. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Accordingly, prejudice is not present even under the more stringent *Chapman* standard. As a result, we need not resolve the question of retroactivity left unanswered in *Lemcke*. (See *Lemcke*, *supra*, 11 Cal.5th at pp. 647–648.) Instead, reversal of appellant's judgment is not warranted and this claim fails.

## II. Instructional Error Did Not Occur Regarding Whether Ferretiz's Testimony Required Corroboration; This Claim Is Also Forfeited and Any Presumed Error Was Harmless.

Appellant argues that the trial court provided jury instructions that confused the jury. He contends the court allowed the jurors to rely on Ferretiz's testimony, the in-

20.

custody informant, without sufficient corroboration. Appellant asserts that reversal is required.

### A. Background.

Appellant's first trial in this matter occurred in 2017. He was tried along with the Reyes brothers. The jury from the first trial was unable to reach a verdict and a mistrial was declared.

In 2017, and after appellant's first trial had already started, Ferretiz met with law enforcement and he relayed his conversation with appellant. At that time Ferretiz was in custody for being a felon in possession of a firearm and ammunition. He had previously been convicted of active participation in a street gang. Ferretiz's pending charges subjected him to a sentence of about eight years in prison.

Ferretiz agreed to testify against appellant. In exchange, he was promised a prison sentence of no more than eight years with the possibility of probation with up to one year in jail. When he testified in this matter, Ferretiz was awaiting sentencing, which was scheduled to occur in about two weeks.

### B. Analysis.

A defendant may not be convicted based on the uncorroborated testimony of an in-custody informant.[16] Instead, the testimony of an in-custody informant must be corroborated by other evidence "that connects the defendant" with the commission of the offense. (§ 1111.5, subd. (a).)

In raising this claim, appellant concedes that the trial court properly instructed the jury with CALCRIM No. 336. In general, this instruction informed the jury that it must

---

[16] The statute defines " 'in-custody informant' " as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution." (§ 1111.5, subd. (b).)

21.

view the testimony of an in-custody informant against appellant "with caution and close scrutiny." This instruction also told the jurors that they could not convict appellant based solely on the testimony of the in-custody informant unless (1) the testimony was supported by other evidence that they believed; (2) the supporting evidence was independent of the testimony; and (3) the supporting evidence connected appellant to the commission of the crimes.

Despite conceding it was proper to instruct with CALCRIM No. 336, appellant contends the trial court gave a conflicting instruction when it used CALCRIM No. 359, which addresses the corpus delicti rule. With this instruction, the jurors were informed that appellant could not be convicted based only on his out-of-court statements unless they first concluded that other evidence showed that the charged crimes were committed. This instruction stated that the other evidence "may be slight, and need only be enough to support a reasonable inference that a crime was committed. *This requirement of other evidence does not apply to prove the identity of the person who committed the crime and the degree of the crime*. If other evidence shows that the charged crime was committed, the identity of the person who committed it, and the degree of the crime may be proved by [appellant's] statement alone. You may not convict [appellant] unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

According to appellant, the highlighted language above shows an inherent conflict between CALCRIM Nos. 336 and 359 because the language from CALCRIM No. 359 regarding the corpus delicti rule permitted the jurors to rely on appellant's own statements (conveyed to Ferretiz) without corroboration to prove both his identity as the perpetrator and the degree of this murder. Appellant asserts that this would have confused the jury. He further argues that the prosecution failed to provide sufficient corroborating evidence. He contends that Ramirez's identification testimony cannot qualify as sufficient corroboration because of its substantial credibility concerns.

22.

Respondent asserts that appellant has forfeited this claim. In the alternative, respondent contends that any presumed instructional error was harmless.

We agree with respondent that appellant has forfeited this claim. We also conclude it is not reasonably likely the jury was confused by the conflicting language it received from CALCRIM No. 359. Finally, we determine that any presumed instructional error was harmless.

### 1. *This claim is forfeited.*

Appellant concedes that he failed to object below when the trial court instructed the jury with CALCRIM No. 359. To overcome forfeiture, appellant argues that this claim impacts his substantial rights and should be reviewed under section 1259. In the alternative, he raises a claim of ineffective assistance of counsel, asserting that his trial attorney could have had no tactical reason for not objecting. Appellant's arguments are unpersuasive.

Our Supreme Court makes it clear that the forfeiture doctrine applies to a defendant who fails to object to a jury instruction. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) As we explain below, it is not reasonably likely the jury was confused in the manner appellant now claims. We also determine beyond any reasonable doubt that any presumed instructional error was harmless. As such, we reject appellant's assertion that this claim impacts his substantial rights and should be reviewed under section 1259. Likewise, because prejudice is not present, appellant cannot demonstrate ineffective assistance based on his counsel's failure to object to the disputed instruction. (See *Strickland v. Washington* (1984) 466 U.S. 668, 699–700; *People v. Mendoza* (2000) 24 Cal.4th 130, 158–159.)

Based on appellant's failure to object below, this claim is deemed forfeited. In any event, we also reject this claim on its merits.

## 2. *It is not reasonably likely the jury was confused.*

Appellant argues that, when read together, the instructions given under CALCRIM Nos. 336 and 359 were in conflict because CALCRIM No. 336 required corroboration for appellant's statements while CALCRIM No. 359 did not. We determine it does not appear reasonably likely that the jury was confused.

In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole and the entire trial record to determine if there is a reasonable likelihood the jury was misled. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Tate* (2010) 49 Cal.4th 635, 696.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.)

Appellant concedes that the trial court properly instructed the jury with CALCRIM No. 336 regarding how to view the testimony of Ferretiz as an in-custody informant. Standing alone, the instruction given under CALCRIM No. 336 was a correct statement of law. (See § 1111.5, subd. (a).) Likewise, standing alone, the instruction given under CALCRIM No. 359 regarding the corpus delicti rule was also a correct statement of law. (See *People v. Cullen* (1951) 37 Cal.2d 614, 624–625 [setting forth the elements of the corpus delicti rule]; *People v. Rosales* (2014) 222 Cal.App.4th 1254, 1261 ["CALCRIM No. 359 correctly states the law."].)

With CALCRIM No. 336, the court made it clear that the jurors must view Ferretiz's testimony "with caution and close scrutiny" because he was an in-custody informant. The jurors were told that they could only use his testimony if it was supported by independent evidence that connected appellant to the commission of the murder.

During closing arguments, the prosecutor told the jurors to examine Ferretiz's testimony "with caution" because he was an inmate who was waiting to be sentenced. The prosecutor made it clear to the jurors that they should not consider Ferretiz's

testimony unless they believed Ramirez's identification of appellant as the third assailant. The prosecutor even cautioned the jurors that, if the only evidence presented in this case was Ferretiz's testimony, "it would be your obligation to acquit, because you cannot convict someone based on the word of an in-custody informant." However, the prosecutor told the jurors that, if they completely discredited Ferretiz's testimony, a conviction was still warranted. Nevertheless, the prosecutor urged the jurors to find Ferretiz's testimony credible.

Defense counsel also argued to the jurors that they could only use Ferretiz's testimony if it was supported by other evidence that they believed. According to defense counsel, no other evidence supported Ferretiz, "other than perhaps [Ramirez's] lying statement." Defense counsel asserted that all of the evidence pointed to Ramirez's guilt as the third assailant.

Based on the closing arguments, we will not presume that the jury was misled by the conflicting language it received in CALCRIM No. 359. To the contrary, it does not appear reasonably likely that the jurors would have believed they could convict appellant for murder based solely on Ferretiz's testimony after both the court and the prosecutor instructed them not to do so. Indeed, defense counsel also reinforced that requirement. Moreover, apart from the conflicting instructional language which appellant has cited, nothing else from this record reasonably suggests that the jury may have been misled.

Finally, the parties note that at least one appellate court has expressed concerns with CALCRIM No. 359. In *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), the court held that CALCRIM No. 359 "is deficient to the extent it lends itself to an interpretation that criminal defendants could be convicted on the basis of extrajudicial statements alone that they committed a crime." (*Rivas*, *supra*, 214 Cal.App.4th at pp. 1427–1428.) *Rivas* concluded that CALCRIM No. 359 "requires reconsideration."

(*Rivas*, *supra*, at p. 1429.) *Rivas*, however, ultimately determined that any instructional error in its matter was harmless.[17] (*Rivas*, at pp. 1429–1430.)

We need not fully address *Rivas*'s holding or determine as a matter of law whether or not CALCRIM No. 359 is deficient. Instead, this record amply demonstrates that it does not appear reasonably likely the jurors would have believed they could convict appellant for murder based solely on Ferretiz's testimony. Appellant fails to demonstrate that the jurors may have reasonably held an erroneous understanding regarding how to use Ferretiz's testimony as an in-custody informant. (See *People v. Cross*, *supra*, 45 Cal.4th at pp. 67–68 [the defendant must demonstrate a reasonable likelihood that the jury understood the challenged instruction in the way asserted by the defendant].) Thus, this claim of instructional error must fail. In any event, we also determine that any presumed error was harmless.

### 3. *Any presumed instructional error was harmless.*

The parties dispute the appropriate standard of review to assess prejudice. According to appellant, the standard from *Chapman* should be used but, in the alternative, he also contends that reversal is required even if the less stringent standard from *Watson*, *supra*, 46 Cal.2d 818 is employed. Appellant raises four points to establish prejudice. First, he argues we should presume the jurors were misled by the conflicting instructions. Second, he notes that the prosecutor relied on Ferretiz's testimony in closing argument to establish an intent to kill. Third, the first trial, which did not feature Ferretiz's testimony, ended with a hung jury. Finally, appellant notes that no forensic evidence connected him with this crime and he insists that Ramirez had "substantial credibility issues" making his testimony insufficient to corroborate Ferretiz's testimony.

---

[17] At least one appellate court has disagreed with *Rivas* and found no instructional error associated with CALCRIM No. 359. (*People v. Rosales*, *supra*, 222 Cal.App.4th 1254, 1258.)

26.

In contrast, respondent argues there is no reasonable likelihood the jurors misinterpreted CALCRIM Nos. 336 and 359 and relied on Ferretiz's testimony without independent supporting evidence. According to respondent, other evidence strongly pointed to appellant's guilt so that any error in giving CALCRIM No. 359 did not infect the trial with such unfairness as to deny due process. Finally, respondent contends that, under *Watson*, there is no reasonable probability that, absent the error, the outcome would have been more favorable to appellant.

We agree with respondent that any presumed instructional error was harmless. However, we need not resolve the parties' dispute regarding the appropriate standard of review. Instead, even under the more stringent standard of *Chapman*, prejudice is not present.

At trial, Ramirez identified appellant as one of the three assailants who attacked Aguayo. Ramirez saw appellant hitting Aguayo on his head and his face, but Ramirez did not see a weapon. After Aguayo fell to the ground, Ramirez saw appellant and the other two assailants kick Aguayo's head.

Ramirez told the jury that he had previously smoked marijuana with appellant before this murder occurred. Ramirez also knew the other assailants, Jesus and Ismael Reyes, because he had smoked marijuana with them. At trial, Ramirez said he was "one hundred percent sure" of his identification of appellant as one of the three boys who beat and killed Aguayo.

Ferretiz testified that, when he was in custody with appellant, appellant had told him that he had been with the Reyes brothers when this murder occurred, and appellant had "plugged him or something like that." Ferretiz understood that the word "plug" meant to stab someone.

We have already explained why it is not appropriate to presume that the jury was confused stemming from the instructions it received. Instead, both the trial court and the prosecutor cautioned the jurors to only credit Ferretiz's testimony as an in-custody

27.

informant if they believed other evidence, such as Ramirez's testimony, linked appellant to this murder. Defense counsel also argued to the jurors that they could only use Ferretiz's testimony if it was supported by other evidence that they believed. Defense counsel asserted that the jury should reject Ramirez's testimony because he had repeatedly lied. According to defense counsel, it was Ramirez who was the third assailant in this murder.

We reject appellant's assertion that the prosecution failed to introduce sufficient corroborating evidence. To the contrary, Ramirez identified appellant in court as the third assailant. His direct testimony was sufficient to prove that fact. (See Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."].) As such, and setting aside Ferretiz's testimony, the prosecution established appellant's direct involvement in this murder. (See § 1111.5, subd. (a).)

Finally, although appellant can point to substantial credibility concerns associated with Ramirez's testimony, the jurors had the exclusive role to judge all questions of fact submitted to them, including witness credibility. (§ 1127; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) Ramirez's testimony was not inherently improbable. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 150 [to reject on appeal a witness who was believed by the trier of fact, either the witness's statements must be physically impossible that they are true or their falsity must be apparent without resorting to inferences or deductions].) Based on the verdicts rendered it is clear that the jury found Ramirez credible and credited his testimony. We will not invade the jury's province and reweigh Ramirez's credibility.

Based on this record, we can declare that any presumed error was harmless. Despite the possibility of confusion stemming from the conflicting language appearing in CALCRIM Nos. 336 and 359, the trial court, the prosecutor and defense counsel each cautioned the jurors not to rely on Ferretiz's testimony unless they believed other

28.

independent evidence connected appellant to the murder.  Through Ramirez's testimony the prosecution presented independent evidence establishing that appellant committed this murder.  Thus, we can declare beyond any reasonable doubt that the alleged instructional error did not contribute to the verdicts.  (See *People v. Aranda*, *supra*, 55 Cal.4th at p. 367.)  In other words, the guilty verdicts actually rendered in this trial were surely unattributable to any presumed error.  (See *Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.)  Accordingly, prejudice is not present under the *Chapman* standard.  Consequently, reversal of appellant's judgment is not warranted and this claim fails.

## III.    Instructional Error Did Not Occur Regarding How the Jury Should Determine the Degree of Murder; This Claim Is Also Forfeited and Any Presumed Error Was Harmless.

Appellant contends that a separate instructional error occurred involving CALCRIM No. 359, which involves the corpus delicti rule.  According to appellant, this instruction, which permitted the jury to use appellant's statements to determine the degree of murder, improperly reduced the prosecution's burden of proof on that issue.  Appellant argues that reversal is required.

In raising this claim, appellant concedes that the instruction provided from CALCRIM No. 359 was legally correct.  He argues, however, that a factual issue arose because appellant's statements conveyed through Ferretiz offered "no insight on the degree of the crime."  According to appellant, because his statements to Ferretiz did not contain proof beyond a reasonable doubt that the crime was intentional or committed with malice, it was error to inform the jury that it could rely on those statements alone to determine the proper degree of murder.

We reject appellant's arguments.  First, this claim is deemed forfeited.  Moreover, this record does not reasonably suggest the jury would have understood the instruction in the manner appellant now asserts.  Finally, we conclude that any presumed instructional error was harmless.

### A.    *This claim is forfeited.*

Appellant concedes that he failed to object below when the trial court instructed the jury with CALCRIM No. 359.  He raises the same grounds against forfeiture that he asserted in section II, above.  We have already rejected those arguments.  Thus, we determine that the forfeiture doctrine should be applied in this situation because appellant did not raise this issue below.  (See *People v. Virgil*, *supra*, 51 Cal.4th at p. 1260.)  In any event, we also reject this claim on its merits.

### B.    *It is not reasonably likely the jury was confused.*

To establish first or second degree murder, the People were required to prove beyond a reasonable doubt that appellant committed an act that caused Aguayo's death, and the act was committed with express malice (intent to kill) or implied malice (conscious disregard for life).  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  For first degree murder, the People had to additionally prove that appellant acted willfully, deliberately, and with premeditation.  (§ 189, subd. (a).)

We reject appellant's assertion that the jury may have erroneously believed it could determine the degree of murder based solely on appellant's statements conveyed through Ferretiz.  During closing arguments, the prosecutor asserted that the jury could find appellant guilty either as a direct perpetrator or because he was aiding and abetting.  According to the prosecutor, an intent to kill was demonstrated in several ways.  First, the three assailants had repeatedly struck and stabbed Aguayo.  Either appellant had held a knife or he had participated in this attack knowing others had knives.  Second, Ferretiz's testimony, which relayed appellant's admission, showed appellant's intent to kill because he had "plugged" Aguayo.  Lastly, appellant did not try to render any aid to Aguayo.

Regarding willfulness, deliberation and premeditation, the prosecutor noted that Jesus Reyes lived at the apartment complex where this murder occurred and the three assailants ran up to Aguayo, asking him, "do you bang."  The prosecutor argued that this

was not a random encounter, but a calculated murder because they brought knives with them. The assailants repeatedly stabbed Aguayo.

Although the prosecutor urged the jury, in part, to use appellant's own statements to find an intent to kill, the prosecutor never argued that the jury should fix the degree of murder based on appellant's admissions to Ferretiz. Instead, the prosecutor argued that first degree murder was proper based on how the assailants had attacked Aguayo.

Appellant fails to demonstrate that the jurors may have reasonably held an erroneous understanding that they could determine the degree of murder based solely on appellant's admissions to Ferretiz. (See *People v. Cross*, *supra*, 45 Cal.4th at pp. 67–68 [the defendant must demonstrate a reasonable likelihood that the jury understood the challenged instruction in the way asserted by the defendant].) Thus, this claim of instructional error must fail. In any event, we also determine that any presumed instructional error was harmless.

### C.     *Any presumed instructional error was harmless.*

Appellant suggests that structural error occurred, requiring reversal without analyzing prejudice. In the alternative, he contends he suffered harm because the prosecutor relied on his statement to Ferretiz, which was insufficient to prove the degree of murder.

We disagree that any presumed error was prejudicial. The totality of the instructions provided to the jury demonstrate that structural error did not occur regarding the burden of proof.[18] Further, reversal is not warranted even under the standard articulated in *Chapman*.

---

[18]     In the context of criminal proceedings, "structural" error involves the basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determining guilt or innocence. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310.) Examples include the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial and an erroneous

With CALCRIM No. 520, the jurors were told that, if they decided appellant had committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree.

With CALCRIM No. 521, the court provided the jury with the elements necessary for first degree murder. With this instruction, the court stated that the prosecution had the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. "If the People have not met this burden, you must find [appellant] not guilty of first degree murder, and the murder is second degree murder."

With CALCRIM No. 570, the jury was informed that a killing that would otherwise be murder is reduced to voluntary manslaughter if appellant had killed because of a sudden quarrel or in the heat of passion. The court provided the elements for those legal concepts. The court concluded this instruction by stating the prosecution had the burden "of proving beyond a reasonable doubt" that appellant did not kill as the result of a sudden quarrel or in the heat of passion. "If the People have not met this burden, you must find [appellant] not guilty of murder."

With CALCRIM No. 580, the court instructed on the concept of involuntary manslaughter. The court provided an explanation regarding the difference between other homicide offenses and involuntary manslaughter, and it provided the elements necessary to find involuntary manslaughter. The court concluded this instruction informing the jurors that, in order to prove murder or voluntary manslaughter, the prosecution bore the burden to prove beyond a reasonable doubt that appellant acted "with the intent to kill, or with conscious disregard for human life. If the People have not met either of those burdens, you must find [appellant] not guilty of murder, and not guilty of voluntary manslaughter."

reasonable doubt instruction to the jury. (*Id.* at pp. 309–310; see also *In re Enrique G.* (2006) 140 Cal.App.4th 676, 685.)

During closing arguments, the prosecutor invited the jury to find an intent to kill, in part, based on appellant's statements to Ferretiz. According to the prosecutor, it could be inferred from appellant's statements that appellant had held a knife during this attack. However, the prosecutor never used appellant's admissions to establish the *degree* of murder. Instead, the prosecutor asserted that this murder was willful, deliberate and premeditated based on how the assailants carried out this attack.

This record demonstrates that the basic trial protections afforded appellant were not violated. Thus, structural error did not occur. (See *Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 309–310; see also *In re Enrique G.*, *supra*, 140 Cal.App.4th at p. 685.) Moreover, any presumed instructional error associated with CALCRIM No. 359 regarding the burden of proof for the degree of murder was harmless beyond any reasonable doubt. The first degree murder verdict actually rendered in this trial was surely unattributable to this presumed error. (See *Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.) Therefore, prejudice is not present under the standard articulated in *Chapman*, and this claim fails.

## IV. Instructional Error Did Not Occur Regarding Ferretiz's Shackles; This Claim Is Also Forfeited and Any Presumed Error Was Harmless.

With CALCRIM No. 337, the trial court instructed the jurors that Ferretiz was physically restrained when he testified and the jurors could not speculate about the reason why. The jurors were told to "completely disregard" this circumstance in deciding the issues in this case, and to not consider this fact for any purpose.

Appellant alleges that this represented instructional error because the jurors were precluded from properly assessing Ferretiz's credibility. He contends that, under the circumstances of this case, this instruction was unconstitutional and reversal is required. We disagree. This claim is forfeited. In any event, it is also without merit.

33.

### A. *This claim is forfeited.*

Appellant voiced no objection below regarding this instruction. To overcome forfeiture, he argues that this claim impacts his substantial rights and should be reviewed under section 1259. In the alternative, he raises a claim of ineffective assistance of counsel. Both arguments are without merit.

As we explain below, the trial court properly instructed the jury with CALCRIM No. 337. We also determine beyond any reasonable doubt that any presumed instructional error was harmless. Accordingly, it is not appropriate to review this claim pursuant to section 1259 and appellant cannot demonstrate ineffective assistance of counsel. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 699–700; *People v. Mendoza*, *supra*, 24 Cal.4th at pp. 158–159.) Thus, this claim is deemed forfeited. (*People v. Virgil*, *supra*, 51 Cal.4th at p. 1260.)

### B. *Instructional error did not occur.*

The Bench Notes to CALCRIM No. 337 direct a trial court to provide this instruction sua sponte if a witness has been physically restrained in a manner that is visible to the jury. If the restraints are not visible, this instruction should not be given.

Our Supreme Court has held that, when visible restraints must be imposed on a witness, a trial court must instruct the jury "that such restraints should have no bearing on the determination of the defendant's guilt. However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*People v. Duran* (1976) 16 Cal.3d 282, 291–292.)

In raising this claim, appellant does not assert that Ferretiz's restraints were concealed from the jury. Thus, in accordance with *People v. Duran*, the trial court appropriately instructed the jury with CALCRIM No. 337 and this claim fails. In any event, prejudice did not occur from any presumed error.

### C.    *Any presumed error was harmless.*

Appellant raises three arguments to establish why he suffered prejudice.  First, he asserts that the jury was unable to fully consider Ferretiz's credibility.  Second, the prosecutor relied on Ferretiz's testimony in closing argument to establish appellant's intent to kill.  Finally, appellant's first trial (in which Ferretiz did not testify) ended in a mistrial.  Appellant maintains that Ferretiz's testimony was the major difference but the second jury was precluded from considering a crucial fact directly related to his credibility.

Appellant's arguments are without merit.  The jury was fully informed that Ferretiz was in custody in the local jail, and had been so for about 14 months, when he testified in this matter.  The jury knew that Ferretiz was a former gang member.  Ferretiz explained his pending criminal charges and he admitted his prior conviction for being an active gang member.  Ferretiz told the jury that he was wearing "green and white stripes" because he was in protective custody as a dropout gang member.  He explained that he went through a debriefing process with law enforcement in the hopes of receiving leniency, and he told them about certain crimes.

The jury learned about Ferretiz's plea agreement.  Ferretiz admitted at trial that he hoped to receive leniency in his own pending criminal matters in exchange for testifying against appellant.  The jury learned that Ferretiz's sentencing was going to occur about two weeks after he testified.

It is abundantly clear the jury was fully informed of Ferretiz's custody status, his criminal history, and his motivation for testifying against appellant.  As such, we can declare beyond any reasonable doubt that any presumed instructional error with CALCRIM No. 337 was harmless.  It is apparent that appellant's convictions in this matter were unattributable to this alleged error.  (See *Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.)  Therefore, prejudice is not present even under the more stringent *Chapman* standard, and this claim is without merit.

35.

**V. The Trial Court Did Not Lower the Burden of Proof Regarding the Active Gang Participation Charge in Count 2.**

With CALCRIM No. 370, the trial court instructed the jurors (in relevant part) that the prosecution was not required to prove that appellant had a motive to commit any of the charged crimes.

In count 2, the jury found appellant guilty of active participation in a criminal street gang under section 186.22, subdivision (a).

Appellant asserts that his motive was a required element of the alleged gang participation charged in count 2. He contends that, once the jury found him guilty of murder in count 1, the "only remaining element" in count 2 "was whether the offense was gang-motivated." He argues that reversal is required because the trial court impermissibly lowered the prosecution's burden of proof.

As an initial matter, the parties dispute whether or not appellant has forfeited this claim in failing to raise it below. We decline to find forfeiture for this issue. Our Supreme Court has held that, if a defendant asserts that motive is an element of the charged crimes and the trial court erroneously told the jury that motive is not a required element, then the issue is preserved for appeal pursuant to section 1259. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Accordingly, we turn to the merits of this claim.

Appellant cites opinions discussing crimes in which motive is an element. One such example involves a special circumstance finding that a murder was carried out for financial gain (§ 190.2, subd. (a)(1)). Another example (which appellant does not cite) is the crime of annoying or molesting a child (§ 647.6, subds. (a)-(c)). For such a crime, a defendant's conduct must be "motivated by an unnatural or abnormal sexual interest" in the child. (CALCRIM No. 1122.) According to appellant, the gang participation charge in count 2 is analogous to cases like these because they all have a "specific intent element" that requires the jury to determine why the person chose to commit the crime.

In *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*), this court rejected the same argument which appellant advances here. In *Fuentes*, we explained that an intent to further criminal gang activity was "no more a 'motive' in legal terms than is any other specific intent." (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1139.) The *Fuentes* court held that an instruction under CALCRIM No. 370 was proper in a case involving a gang participation charge (§ 186.22, subd. (a)) because it is unnecessary to establish motive to prove a defendant intended to further gang activity. (*Fuentes*, *supra*, 171 Cal.App.4th at pp. 1139–1140.)

Appellant contends that *Fuentes* was wrongly decided and it should be reconsidered for two reasons. First, *Fuentes* failed to discuss any of the Supreme Court's cases involving crimes that require proof of *why* a crime was committed. Second, *Fuentes* failed to consider why the Supreme Court has rejected an attack on the motive instruction in the financial gain special circumstance context. According to appellant, the Supreme Court in those cases has not relied on a technical distinction between intent and motive, which occurred in *Fuentes*. Appellant urges us not to follow *Fuentes*.

We reject appellant's arguments and we decline to reconsider *Fuentes*. Appellant's motive was not a required element for the crime of active participation in a criminal street gang under section 186.22, subdivision (a). The elements of street terrorism are: "(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.] All three elements can be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related." (*People v. Albillar* (2010) 51 Cal.4th 47, 56.)

Appellant's claim fails because a perpetrator's *reasons* for committing the crime of active participation in a criminal street gang are unimportant. "[S]pecific intent to

37.

*benefit* the gang is not required," but rather " 'specific intent to promote, further, or assist in any criminal conduct by gang members ....' " (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)  By the terms of the statute, a prosecutor must only prove that a gang defendant promoted, furthered, or assisted in felonious conduct, not *why* he or she may have done so.  Consequently, because the street terrorism offense did not require the jury to determine appellant's motive, instructing the jury with CALCRIM No. 370 did not reduce the prosecution's burden of proof.  This challenge is without merit.

**VI.  A Limited Remand Is Not Warranted for a *Franklin* Proceeding due to Forfeiture and Because Appellant Has a Statutory Remedy.**

Appellant, who was born in 1996, was 17 years old when this homicide occurred.  He received an indeterminate prison term of 25 years to life for this murder.[19]  In 2018, his sentence in this matter was consolidated with three other unrelated criminal matters, all of which appellant resolved through plea agreements.  He received an aggregate determinate prison term of seven years eight months, and a consecutive aggregate indeterminate prison term of 32 years to life.

Appellant requests a limited remand so he may have a *Franklin* hearing to preserve evidence for his future youth offender parole hearing (§ 3051, subd. (a)(1)).  According to appellant, no mention of *Franklin* occurred when he was sentenced in this matter in 2018, and his trial counsel never offered any relevant *Franklin* material.

Respondent opposes this request, contending a remand for a *Franklin* hearing is not warranted.  Respondent cites *People v. Medrano* (2019) 40 Cal.App.5th 961 (*Medrano*) for the proposition that appellant has forfeited his opportunity for a *Franklin* proceeding because he failed to exercise that right in 2018.  Respondent, however, asserts

---

**19**     Appellant's sentence in count 2 for active participation in a criminal street gang was stayed pursuant to section 654.  Likewise, the gang enhancement found true in count 1 was also stayed.

that appellant nevertheless possesses a statutory remedy pursuant to section 1203.01 to preserve any relevant information for his future youth offender parole hearing.

Appellant argues that we should not follow *Medrano*. According to appellant, denying a remand will delay his ability to obtain a *Franklin* proceeding. He also contends his inaction from 2018 should be insufficient as a matter of law to waive his rights in this situation. Finally, he asserts that, once this appeal ends, he will not have the assistance of counsel to file a motion pursuant to section 1203.01, or to represent him.

We agree with respondent that a limited remand is not warranted. Appellant was sentenced in this matter in November 2018, which occurred more than two years after the Supreme Court issued *Franklin* in May 2016. As in *Medrano*, the record here "contains no indication that [appellant] was not given an adequate opportunity to make a record of mitigating youth-related evidence as contemplated in *Franklin*." (*Medrano*, *supra*, 40 Cal.App.5th at p. 967.) In other words, "[t]he record does not indicate that [his] opportunity to exercise that right was inadequate in any respect. Rather, it appears that he merely failed—whether by choice or by inadvertence—to exercise it." (*Ibid.*)

Appellant does not contend that his trial counsel was ineffective in failing to seek a *Franklin* proceeding at the 2018 sentencing.[20] He also makes no representations regarding what evidence, if any, he hopes to preserve for his future youth parole eligibility hearing if this matter is remanded. As such, we agree with respondent that a limited remand is not warranted.

In any event, appellant possesses an adequate statutory remedy should he wish to preserve evidence for his future youth parole eligibility hearing. In 2019, our high court in *Cook* held that a juvenile offender whose conviction and sentence are final may file a motion under section 1203.01 for the purpose of making a record of mitigating youth-

---

[20]    We note that, if appellant had raised a claim of ineffective assistance of counsel, that claim would fail due to a lack of prejudice because appellant has a statutory remedy under section 1203.01.

related evidence. (*Cook*, *supra*, 7 Cal.5th at pp. 446–447; *Medrano*, *supra*, 40 Cal.App.5th at p. 963 [resolving a similar claim on appeal].) Thus, following the disposition in *Medrano*, we will affirm appellant's judgment without prejudice to his right to file a motion for a *Franklin* proceeding under the authority of section 1203.01 and *Cook*. (See *Medrano*, *supra*, 40 Cal.App.5th at p. 968.)

## VII. Cumulative Error Did Not Occur.

Appellant argues that reversal is required based on cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*Rivas*, *supra*, 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

We reject appellant's claim of cumulative error because we have denied all of his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication.

## VIII. The Gang Enhancement in Count 1 and the Gang Conviction in Count 2 must be Reversed Following the Passage of Assembly Bill No. 333.

Section 186.22 makes it a crime to actively participate in a "criminal street gang," and the statute provides for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subds. (a), (b)(1).)

At trial, the parties stipulated that appellant's gang, SSL, is a criminal street gang and its "members alone and together engage in and have engaged in a pattern of criminal gang activity." In accord with the law at the time, the parties stipulated that (1) "the most recent crime [committed by the gang] occurred within three years of one of the earlier crimes" and (2) the crimes were "personally committed by two or more persons."

Appellant's jury found true the gang enhancement in count 1 (former § 186.22, subd. (b)(1)). The jury convicted him in count 2 of active gang participation (former § 186.22, subd. (a)).

Effective January 1, 2022, the Legislature enacted Assembly Bill No. 333, which amended section 186.22 to impose new requirements for gang enhancement allegations and the substantive offense of gang participation. It amended the definitions of "criminal street gang" and "pattern of criminal gang activity" and clarified the evidence needed to establish if an offense benefits, promotes, furthers or assists a criminal street gang. Previously, the statute defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons … whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill No. 333 narrowed the definition to "an ongoing, organized association or group of three or more persons … whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)

Regarding a "pattern of criminal gang activity," the prosecution previously needed to prove "only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another." (*People v. Sek* (2022) 74 Cal.App.5th 657, 665, citing former § 186.22, subd. (e).) Assembly Bill No. 333 made several changes to this definition. First, the predicate offenses now must have been committed by two or more "members" of the gang (as opposed to any persons). (§ 186.22, subd. (e)(1).) Second, the predicate offenses must be proven to have "*commonly* benefited a criminal street gang." (*Ibid.*, italics added.) Third, the last predicate offense must have occurred within three years of the date of the currently charged offense. (*Ibid.*) Fourth, the list of qualifying predicate offenses has been reduced. (*Ibid.*) Finally, the currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).)

Assembly Bill No. 333 now requires that any benefit a gang derives from the predicate and current offenses be "more than reputational." (§ 186.22, subd. (g).) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Assembly Bill No. 333 added section 1109, which establishes a new procedure for trying substantive offenses and enhancements under section 186.22. Section 1109, subdivision (a), requires the court to bifurcate the trial of any gang enhancements, upon the defendant's request. Section 1109, subdivision (b), requires trial courts to try the substantive offense of gang participation "separately from all other counts that do not otherwise require gang evidence as an element of the crime," whether or not requested by the defense.

The parties agree, as do we, that these amendments apply retroactively in this matter. Appellant's judgment of conviction is not yet final on appeal. Thus, he benefits from this ameliorative change in law. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 [Assem. Bill No. 333 has retroactive effect; see also *In re Estrada* (1965) 63 Cal.2d 740, 744 [when a change in law reduces the punishment for a crime, defendants with nonfinal judgments are entitled to those "ameliorating benefits"].)

In light of Assembly Bill No. 333, the parties agree that the true finding regarding the gang enhancement in count 1, and the gang participation conviction in count 2 must both be reversed. The parties note that the trial stipulation did not address some of the substantive requirements that now exist as a result of Assembly Bill No. 333. We agree. The trial stipulation no longer complies with the elements necessary to find the crime of active gang participation (§ 186.22, subd. (a)) or the jury's true finding for the gang enhancement allegation (§ 186.22, subd. (b)(1)). Accordingly, we will reverse both the true finding regarding the gang enhancement in count 1 and the gang participation

42.

conviction in count 2. As appellant concedes, however, a retrial is permissible in this situation. (See *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72, fn. 2.) Consequently, we remand this matter for further proceedings.

## DISPOSITION

The true finding in count 1 regarding the gang enhancement is reversed. The conviction in count 2 is reversed. Appellant's sentence is vacated and this matter is remanded for further proceedings. The prosecution shall have the option to retry appellant regarding the gang enhancement in count 1 and/or the charge of active gang participation in count 2. If the People do not bring appellant to retrial within 60 days of filing the remittitur in the trial court pursuant to section 1382, subdivision (a)(2), or obtain a waiver of time by appellant, the trial court shall resentence appellant accordingly. In all other respects, the judgment is affirmed without prejudice to appellant filing a motion for a *Franklin* proceeding under the authority of section 1203.01 and *Cook*, *supra*, 7 Cal.5th at p. 460.

LEVY, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.

43.